932 So.2d 800 (2005)
Charles W. RUSH, Appellant
v.
Latresa A. RUSH, Appellee.
No. 2004-CA-00260-COA.
Court of Appeals of Mississippi.
August 9, 2005.
Rehearing Denied November 29, 2005.
*802 Stephen L. Beach, Jackson, attorney for appellant.
William D. Ketner, Jackson, attorney for appellee.
Before BRIDGES, P.J., CHANDLER and ISHEE, JJ.
CHANDLER, J., for the Court.
¶ 1. Charles Rush and Latresa Rush were granted a divorce in the Rankin *803 County Chancery Court. Charles is a one-third owner of an air conditioning service, which the chancellor valued at $179,000. The chancellor found that none of the value of the air conditioning service was attributable to Charles' goodwill. Latresa was found to be entitled to $89,000, and the chancellor secured Latresa's payment by imposing a judicial lien on the former marital home. Charles was granted primary physical custody of the parties' minor child, but he was ordered to pay $400 per month in child support and $500 per month in periodic alimony to Latresa. Charles appeals, raising the following issues:
I. WHETHER THE CHANCELLOR ERRED IN DECLARING THAT THE GOODWILL OF HERMETIC RUSH SERVICES, INC. WAS A MARITAL ASSET THAT COULD BE DIVIDED BETWEEN THE PARTIES
II. WHETHER THE CHANCELLOR ERRED IN AWARDING CHILD SUPPORT PAYMENTS TO LATRESA
III. WHETHER THE CHANCELLOR ERRED IN AWARDING LATRESA PERIODIC ALIMONY
IV. WHETHER THE CHANCELLOR ERRED IN PLACING A JUDICIAL LIEN ON CHARLES' HOME TO SECURE PAYMENT OF CHARLES' INTEREST IN HERMETIC
¶ 2. Finding no error, we affirm.

FACTS
¶ 3. Charles W. Rush and Latresa A. Rush were married on October 22, 1983, and separated in August of 2001. The marriage produced two children, Charles Sean Rush ("Sean"), born July 10, 1984, and Rose Marie Rush ("Rosie"), born October 14, 1991. On July 26, 2002, Charles filed a complaint for divorce on the grounds of Latresa's adultery. In his complaint, Charles requested custody of the children and an equitable distribution of the marital property. On September 13, 2002, Latresa filed a motion for relief, where she requested custody of the children, child support, alimony, and an equitable distribution of property. Before the divorce was finalized, Charles had physical custody of Sean and Latresa had physical custody of Rosie, and Charles paid $1,000 per month in child support.
¶ 4. Trial was held on September 3 and 4, 2003. At the beginning of the trial, Latresa admitted to uncondoned adultery. The chancellor granted a judgment of divorce in favor of Charles and retained jurisdiction to resolve matters relating to child custody, child support, and division of the marital property.
¶ 5. Charles is an air conditioning technician and owns a one-third interest, or 100 shares, in a business called Hermetic Rush Services, Incorporated ("Hermetic"). Latresa was not employed during the time she and Charles were separated, but she helped operate Charles' business as a bookkeeper and secretary for approximately six years, and she also occasionally worked in temporary contract agencies at various times during the marriage. At the time of the trial, Latresa was attending community college part-time pursuing a degree in cosmetology.
¶ 6. The chancellor appointed Pace and Company, Ltd., to value Hermetic. Kevin Lightheart completed this evaluation on December 16, 2002. Lightheart valued Charles' stock in Hermetic at $1,790 per share, for a total of $179,000. Goodwill was not discussed in this valuation. After the valuation report was completed, Charles' attorney made an ex parte request to Lightheart inquiring what part, if any, of the value of the business was attributable to Charles' goodwill in the corporation. *804 Lightheart submitted a letter stating that $120,000 of the $179,000 was attributable to goodwill, although he gave no analysis in the letter or to the court as to how he reached this conclusion. The letter was not submitted into evidence.
¶ 7. After hearing all the evidence, the chancellor valued Hermetic at $179,000 and found that none of the value of the business was attributable to Charles' goodwill. Latresa was found to be entitled to receive $89,000, and the chancellor placed a judicial lien on Charles' house[1] to secure payment. The chancellor granted to Charles and Latresa joint legal and physical custody of Rosie, with Charles as the primary physical custodian.[2] Although Charles was named primary physical custodian, he was ordered to pay to Latresa $400 per month in child support and $500 per month in periodic alimony.

ANALYSIS

I. WHETHER THE CHANCELLOR COMMITTED MANIFEST ERROR IN DIVIDING THE ASSETS OF HERMETIC RUSH SERVICES
¶ 8. Charles has spent all of his working years in the refrigeration and air conditioning business. He operated a sole proprietorship known as Rush Service Company from 1988 until 1995. In 1995, Jimmy Jones and L.D. Carpenter created a partnership. The next month, they merged with Charles' sole proprietorship. Hermetic is now a profitable and successful company and employs twenty-five technicians. Charles manages and supervises the technicians, Carpenter controls the financial aspects, and Jones provides the marketing. Carpenter serves as the president; Jones serves as the vice president; and Charles serves as the secretary/treasurer. Charles receives a regular salary and bonuses. Charles' financial statement reveals that he earns approximately $7,800 per month, after taxes.
¶ 9. Mississippi prohibits the inclusion of goodwill in valuing a business for purposes of distributing marital property. Singley v. Singley, 846 So.2d 1004, 1011(¶ 18) (Miss.2002). "Goodwill within a business depends on the continued presence of the particular professional individual as a personal asset and any value that may attach to that business as a result of that person's presence." Id. at 1011(¶ 18). "[T]he bottom line is one must arrive at the `fair market value' or that price at which property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts." Id.
¶ 10. The Mississippi Supreme Court further clarified the definition of goodwill as it relates to distribution of marital property in Watson v. Watson, 882 So.2d 95 (Miss.2004). The court distinguished between enterprise goodwill and personal goodwill. "Enterprise goodwill `is based on the intangible, but generally marketable, existence in a business of established relations with employees, customers and suppliers.'" Id. at 105(¶ 43) (quoting Yoon v. Yoon, 711 N.E.2d 1265, 1268 (Ind.1999)). By contrast, personal goodwill is a personal asset and is not divisible at divorce. "This is true because `any value that attaches to a business as a result of this "personal goodwill" represents *805 nothing more than the future earning capacity of the individual.'" Id. at 105(¶ 44) (quoting Yoon, 711 N.E.2d at 1269).
¶ 11. The Mississippi Supreme Court concluded that, although there is a distinction between enterprise goodwill and personal goodwill, neither should be included for purposes of valuing a professional solo practice. "In such cases, the two are simply too interwoven and not divisible." Id. at 105(¶ 46).
¶ 12. As the chancellor recognized, the case sub judice is different from Singley and Watson, because Charles' business is not a sole proprietorship or a professional practice. Rather, Charles is part owner of a service-oriented company which repairs, services and maintains industrial, commercial, governmental and residential heating and air conditioning systems. Therefore, the chancellor analyzed whether the value of Hermetic contained any goodwill.
¶ 13. Even though Lightheart stated in a letter that $120,000 of the $179,000 of Charles' interest in the business was attributable to Charles' goodwill, the facts show that Lightheart's valuation of Charles' share of Hermetic at $179,000 reflected only the fair market value of the business. At the end of Lightheart's letter on December 16, 2002, Lightheart explained that the valuation of $179,000 represents "33.33 percent of the ownership of the Company would change hands between a willing buyer and willing seller when neither is under compulsion to act and both parties have reasonable knowledge of all the relevant facts." The chancellor found that Lightheart's letter in response to Charles' attorney's ex parte request was taken out of context and obtained in violation of the Mississippi Rules of Civil Procedure.
¶ 14. When the chancellor questioned Lightheart, Lightheart testified that the business could operate without Charles and not lose any profitability.
BY THE COURT: You are attempting to tabulate a value from the prospect of a willing buyer and a willing seller, not under any coercion or duress on the sale. Now, in this particular business, can you break down for the Court the good will aspect of this business? I understand you've got three individuals that are primarily associated with the business. Describe if you would, in as general terms or in as specific terms as you would care to what influenced the good will aspect, both from the enterprise and a personal standpoint had in your valuation.
BY LIGHTHEART: Goodwill is a subject of the intangible assets. And as I attempted [to say] in the letter to Mr. Beach, that, in this type of business, there is very little personal good will. And it goes to become the definition of business good will versus personal good will, because personal good will is tied to the earnings capacity of the individual. In other words, if that individual went away, would the company still continue as it was.
BY THE COURT: Is your answer in this particular case yes?
BY LIGHTHEART: Yes, I believe it would. And I actually said in my letter, referring specifically to personal good will, that there is none or very little in this particular business.
¶ 15. On all the evidence that was presented, the chancellor held that Charles was not an essential, irreplaceable part of Hermetic and that the business would operate normally if Charles were to leave. Therefore, this holding was based on Lightheart's testimony, as well as the fact that Hermetic now provides a wide range of services and employs many highly *806 skilled personnel. Charles himself testified that he was nothing more than an air conditioning technician. He admitted that out of the twenty five other technicians employed by Hermetic, there were many others who could do his job. In addition, some of his employees are licensed engineers, whereas Charles is not a licensed engineer.
¶ 16. Carpenter, a co-owner of Hermetic, testified that "the business would probably end up being dissolved" if Charles were to leave it. This opinion was based on the fact that Charles is the only shareholder who is knowledgeable about the technical aspects of the air conditioning business. However, the chancellor was within his discretion in finding that there was no goodwill in Hermetic, because the chancellor was presented with substantial evidence supporting this finding. See, e.g., Chamblee v. Chamblee, 637 So.2d 850, 860 (Miss.1994).

II. WHETHER THE CHANCELLOR COMMITTED MANIFEST ERROR IN AWARDING CHILD SUPPORT PAYMENTS TO LATRESA
¶ 17. The parties' minor child Rosie is physically healthy, but she has exhibited some behavioral problems stemming from attention deficit disorder, depression, and anxiety. Charles testified that Rosie had issues that needed attention through counseling and medical treatment. He admitted that Rosie had needs beyond those of a normal child and agreed to help financially to address those needs.
¶ 18. The chancellor granted joint legal and physical custody of Rosie, with Charles as the primary physical custodian. Nevertheless, he ordered Charles to pay child support to Latresa. "[A]n order that does not require a non-custodial parent to pay child support should be entered only in rare circumstances. The chancellor should also include detailed findings in the order to support the decision to relieve a non-custodial parent from their financial obligation to support their children." Brawdy v. Howell, 841 So.2d 1175, 1179(¶ 16) (Miss.Ct.App.2003) (citing Knutson v. Knutson, 704 So.2d 1331, 1334 (Miss.1997)).
¶ 19. In his ruling, the chancellor stated that the child support guidelines of Mississippi Code Annotated Section 43-19-101 did not apply, based on the needs of Rosie and based on the disparity of income between Charles and Latresa. Accordingly, the chancellor applied the statutory criteria for overcoming the presumption that the child support guidelines were appropriate. Miss.Code Ann. § 43-19-103 (Rev.2004). Some of the factors that a chancellor should consider include the parties' respective incomes, the shared parental arrangement, the earning ability of the parties, and the extraordinary medical, psychological, educational, or dental expenses of the child. Id.
¶ 20. The chancellor ordered Charles to pay $400 per month as child support and also ordered Charles to maintain a policy of health insurance covering Rosie, with Charles and Latresa each paying half of any medical or dental expenses incurred for Rosie's benefit. The chancellor justified this award by noting the disparity in income between Charles and Latresa, by noting the fact that Latresa has joint legal custody over Rosie and enjoys extended visitation with Rosie, and by recognizing the high level of medical expenses incurred on Rosie's behalf. In addition, when the chancellor denied Charles' motion for reconsideration the chancellor added that Charles voluntarily and willingly paid $1,000 per month for Rosie's care while the parties were separated.
¶ 21. In Hensarling v. Hensarling, 824 So.2d 583, 588(¶ 15) (Miss.2002), *807 the Mississippi Supreme Court upheld the chancellor's ruling that the child support guidelines were inapplicable, where the exhusband had the ability to earn a substantial income as a doctor and the ex-wife had no source of income. "[T]he statutory guidelines regarding child support are not absolute, and the actual circumstances in each case are to be taken into consideration by the chancellor when making his award." Id. (citing Thurman v. Thurman, 559 So.2d 1014, 1017-18 (Miss.1990)). In the present case, the chancellor properly considered statutory guidelines that would justify granting child support to the parent who does not have primary physical custody of the minor child.

III. WHETHER THE CHANCELLOR ERRED IN AWARDING LATRESA PERIODIC ALIMONY
¶ 22. The chancellor awarded periodic alimony to Latresa in the amount of $500 per month. In making this award, the chancellor cited each of the factors cited in Armstrong v. Armstrong, 618 So.2d 1278 (Miss.1993). The Armstrong factors include (1) the income and expenses of the parties; (2) the health and earning capacities of the parties; (3) the needs of each party; (4) the obligations and assets of each party; (5) the length of the marriage; (6) the presence or absence of minor children in the home; (7) the age of the parties; (8) the standard of living of the parties at the time of the marriage and at the time of the support determination; (9) the tax consequences of the spousal support order; (10) marital fault or misconduct; (11) wasteful dissipation of assets by either party; and (12) any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support. Id. at 1280.
¶ 23. In justifying the award for alimony, the chancellor considered Charles' income as compared to Latresa's preference not to work until the divorce was concluded. Furthermore, the chancellor considered the fact that Latresa's expenses were minimized during the separation period because she was living with her parents at the time, meaning that her monthly expenses would increase after the divorce. In addition, the chancellor considered the fact that the marriage was a lengthy marriage, the fact that the parties' enjoyed a relatively high standard of living during the marriage, and the fact that Latresa relied on Charles' financial support for most of the marriage.
¶ 24. "[M]arital misconduct [for purposes of dividing marital property] is a viable factor entitled to be given weight by the chancellor when the misconduct places a burden on the stability and harmony of the marital and family relationship." Singley, 846 So.2d at 1007(¶ 8). Charles claims that he should not be required to pay alimony because the chancellor granted a divorce on the grounds of Latresa's adultery. However, the chancellor specifically considered the issue of marital fault before awarding periodic alimony. The chancellor did not condone her behavior but he did note that Latresa's acts of infidelity occurred while the parties were separated. In other words, the evidence shows that Latresa's affair did not contribute to the demise of the marriage.
¶ 25. In addition, Charles accuses Latresa of unnecessarily dissipating a considerable sum of assets during the course of the marriage. During the marriage Latresa started several unsuccessful business ventures, including a sewing enterprise, an accounting service, a DJ enterprise, and a dance club known as Club Rush. The chancellor considered these failed business ventures and found that these ventures were known of and consented to by Charles. The chancellor also considered Latresa's one-time $10,000 loss in the stock market *808 while day trading stock on the Internet, without Charles' knowledge or consent. The chancellor did not consider Latresa's Internet day trading to be sufficient to deny an award of alimony, because the incident was an isolated incident in a long marriage.
¶ 26. Charles also believes the chancellor's alimony award was in error because he claims that Latresa has marketable job skills. However, the testimony showed that Latresa has very little education or work experience. She completed only one year of community college, and she did not work for most of the marriage.
¶ 27. The chancellor considered and applied the Armstrong factors when he awarded periodic alimony to Latresa. Therefore, we affirm.

IV. WHETHER THE CHANCELLOR ERRED IN PLACING A JUDICIAL LIEN ON CHARLES' HOME TO SECURE PAYMENT OF CHARLES' INTEREST IN HERMETIC
¶ 28. Before Charles and Latresa came to trial, Charles paid $11,980 for Latresa's share of the home's equity. Charles took exclusive use, possession, and ownership of the home, and the parties stipulated that the marital home was no longer considered marital property. However, the chancellor placed a judicial lien on the home in Latresa's favor to secure the $89,000 payment for Latresa's interest in Hermetic.
¶ 29. Charles infers that the chancellor acted arbitrarily and capriciously by extending the parties' legal relationship. Charles correctly notes that a division of marital property should be reached with the goal of concluding the parties' legal relationship, to the extent possible. Ferguson v. Ferguson, 639 So.2d 921, 928 (Miss.1994). Charles imputes error because the chancellor allowed Latresa an interest in property that is non-marital.
¶ 30. Contrary to Charles' characterization of the judicial lien, Latresa does not have a possessory interest in Charles' home. Equitable liens are not estates or property in the thing itself, nor are they rights which may be the basis of a possessory action. "They are merely a charge on property for the purpose of security, and are ancillary to and separate from the debt. They are neither debts nor rights of property, but merely remedies for a debt. Of extreme importance is the fact that such liens do not divest the debtor of title or possession." Lindsey v. Lindsey, 612 So.2d 376, 380 (Miss.1992). Because Latresa does not have an interest in the house itself, this issue is without merit.
¶ 31. THE JUDGMENT OF THE CHANCERY COURT OF RANKIN COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., BRIDGES, P.J., MYERS AND ISHEE, JJ., CONCUR. IRVING, J., CONCURS IN PART AND DISSENTS IN PART JOINED BY LEE, P.J., AND BARNES, J. GRIFFIS, J., NOT PARTICIPATING.
IRVING, J., Concurring in Part, Dissenting in Part:
¶ 32. I agree with the majority's decision with respect to issues one, three, and five. However, I do not agree that Charles, the parent who has the primary physical custody of the parties' minor child, should be required to pay child support to Latresa, the non-custodial parent. Therefore, I concur in part and dissent in part.
¶ 33. I first point out that, in my judgment, it is not clear from the record that *809 Charles and Latresa were awarded joint physical custody of their minor daughter as the majority asserts. It is clear, however, that they were given joint legal custody of their minor daughter. It also is clear that Charles was given primary physical custody of the minor child.
¶ 34. On September 3, 2003, the chancellor granted Charles a divorce from Latresa on the ground of adultery and reserved ruling, inter alia, on the issue of child custody and support. On January 8, 2004, the chancellor entered a supplement to the judgment of divorce in which he ordered the following:
1. Charles W. Rush is awarded primary physical custody of Rose Marie Rush, a minor female child born October 14, 1991. Both parties shall have joint legal custody of Rose Marie Rush.[3]
2. Latresa A. Rush shall have visitation rights with Rose Marie Rush as set forth in Exhibit "A" hereto. In addition, Latresa A. Rush shall have visitation with Rose Marie Rush every Tuesday from the time Rose Marie Rush gets out of school on Tuesday, and Latresa A. Rush shall return Rose Marie Rush to school on Wednesday, if school is session, [sic] and if not, to return Rose Marie to Charles W. Rush.
¶ 35. Although the supplement to the judgment of divorce makes reference to visitation rights which are set forth in an exhibit "A" attached to the supplement to the judgment of divorce, the record contains no such exhibit. Perhaps the exhibit reference is to the ruling of the court. In this regard, the record reflects the following visitation as set forth in the ruling of the trial court which was entered on December 3, 2003:
Otherwise, if not agreed, the mother shall have custody/visitation with Rosie on alternate weekends from 6:00 p.m. on Friday until 6:00 p.m. on Sunday immediately following, and at those times generally recognized by the court as regular visitation.[4] This will include extended periods during the summer, Christmas, and other holidays, as well as other times generally recognized by the Court as periods of standard visitation. In addition to those generally recognized times, Mrs. Rush shall have custody/visitation with Rosie overnight each week on Tuesday nights, with the mother to enjoy such custody/visitation beginning at the time Rosie gets out of school on Tuesday and ending upon her return to school on Wednesday, and with the mother to be responsible for picking up Rosie from school on Tuesday afternoon and thereafter returning her to school at the conclusion of that visitation period if school is in session the following Wednesday, or to Mr. Rush at 8:00 a.m. on the following Wednesday, if school is not in session.
¶ 36. The chancellor acknowledged that, due to the nature of the custodial arrangement, the child support guidelines were inappropriate and not reasonable. I agree with this observation. However, I cannot discern the appropriateness of ordering *810 Charles to pay child support to Latresa. In arriving at his decision, the chancellor mentioned the large disparity in income and in earning ability between the parties. Although there is a substantial disparity in Charles's and Latresa's incomes, there is also a large disparity in the time in which Charles and Latresa will have custody of the minor child. Charles will have custody of the minor child for the overwhelming majority of the time. It seems to me that not requiring Latresa, the non-custodial parent, to pay child support is a sufficient adjustment for the disparity in income. Making the adjustment the other way seems to have the effect of placing a double child support burden on Charles, particularly, in light of the fact that he will have to provide for the minor child on a regular and continuous basis. The amount of time encompassed by Latresa's periods of visitation with the minor child can hardly justify placing an additional financial burden on Charles in the way of child support. In my judgment, the chancellor abused his discretion and erred by ordering Charles to pay child support while at the same time awarding to Charles the physical custody of the child for whom the child support payments were ordered.
¶ 37. Although, as mentioned in the first part of this opinion, I agree with the majority's finding that the chancellor did not err in ordering Charles to pay periodic alimony, I do so because of the express finding by the chancellor that the un-condoned adultery of Mrs. Rush occurred after the parties had their final separation. Having expressed my agreement with the majority on this issue, I hasten to add that, while our case law does not prohibit a chancellor from awarding alimony to an adulterous spouse (Hammonds v. Hammonds, 597 So.2d 653, 655 (Miss.1992)), I strongly disagree that that should be the law if the adultery was the cause of the failure of the marriage. It seems to me that rewarding the adulterous spouse, who caused the breakup of the marriage, with alimony sends the wrong message. Such action certainly does nothing to strengthen the institution of marriage and even perhaps aids in its destruction. Consider the situation where one spouse has a substantial wage earning capacity or is independently wealthy and the other spouse has a drastically small wage-earning capacity and is not independently wealthy. It might be very tempting to the less financially secure spouse to deal with a troubled marriage not by engaging in an exhaustive effort to rekindle the relationship, but by seeking a new love outside of the marriage as long as the offending spouse knows that even if his/her conduct causes the marriage to ultimately fail, he/she will be taken care of financially by way of alimony.
¶ 38. For the reasons expressed, I concur in part and dissent in part. I would affirm on all issues except the issue of child support. As to the child support issue, I would reverse and render.
LEE, P.J., AND BARNES, J., JOIN THIS SEPARATE WRITTEN OPINION.
NOTES
[1] Charles took exclusive title to the former marital home by paying Latresa her share of the home equity.
[2] After Charles filed his complaint for divorce, Sean became emancipated by virtue of joining the United States Navy.
[3] The majority says that the parties were granted joint physical custody as well. In my judgment, the record does not support such an emphatic statement of fact. In the ruling of the court, the chancellor does find that "the best interest and welfare of the child and the weight of the Albright factors favor joint legal and physical custody of Rosie." However, neither the judgment of divorce nor the supplement to the judgment of divorce recites that physical custody shall be joint.
[4] Throughout the ruling of the court, the chancellor refers to the minor child as "Rosie." However, the complaint, as well as the judgment of divorce, and supplement to judgment of divorce, refers to the minor child as "Rose."