*930
 
 CARLTON, J.,
 

 for the Court:
 

 ¶ 1. Suzanne B. Cox appeals the judgment of the Hinds County Chancery Court, which granted her a divorce from her husband, Lawrence A. Cox, Jr. (Larry), on the ground of irreconcilable differences. Suzanne finds error in both the chancellor’s division of the marital assets and the chancellor’s judgment not to award her alimony. Finding no error in the chancery court’s decision, we affirm.
 

 FACTS
 

 ¶ 2. Larry and Suzanne married in 1990. The marriage was a second marriage for both Larry and Suzanne. Larry and Suzanne have no children together.
 

 ¶ 3. At the time of the marriage, Larry owned Steel Service Corporation (SSC) and acted as chief operating officer of the company. Larry also owned other companies related to the structural steel industry. Suzanne worked as a model and buyer for a local Jackson clothier at the time of the marriage. Suzanne quit working after the marriage to be a homemaker and to travel with Larry. Until their separation in 2005, the couple lived in a home that Larry owned prior to the marriage.
 

 ¶ 4. Larry founded SSC in 1969 with a partner. In 1986, four years before the marriage, Larry purchased his partner’s interest in the business and became SSC’s sole owner. Larry paid $3,800,000 for his partner’s interest in the business. In 1988, two years before the marriage, Larry formed Steel Solutions, Inc., a company that designed a computer software program tailored to the steel service industry. Larry originally formed Steel Solutions with a partner, but Larry ultimately bought his partner’s interest and became the sole owner. In 1996, Larry formed another software company, 3-Design, LLC, of which he owned a fifty-percent interest. Additionally, Larry invested funds into a separate company, Steel Fabrications, Inc., and purchased a 1978 Grumman airplane with his separate funds through Cougar, Inc., a holding company.
 

 ¶ 5. Suzanne worked in the home for the majority of the couple’s fifteen-year marriage. According to Suzanne, Larry encouraged her to quit working so she would be available to travel with him on business trips. Larry paid Suzanne’s premarital debt that included approximately $11,000 of credit card debt. Suzanne testified that she maintained the couple’s home for the first ten years of the marriage, tending to the cleaning, laundry, shopping, and errands. Suzanne further testified that she entertained Larry’s friends and employees by hosting dinner parties in their home often. Suzanne organized charity events and business events in their home, hiring caterers and staff and overseeing the events. According to Suzanne, she received no regular housekeeping help during the first ten years of the marriage. When she returned to full-time work in 2000, Suzanne hired a housekeeper who came to the home twice per month.
 

 ¶ 6. Larry managed the couple’s finances during the marriage. He paid almost all of the household expenses, and he gave Suzanne a monthly stipend of $2,000 for her personal expenses. Suzanne testified that she bought groceries, liquor, clothing, and cosmetics with her monthly $2,000 stipend. She also supported the marriage by writing the checks for the private school tuition for Larry’s grandchildren. The couple lived in the home Larry owned prior to the marriage. Larry purchased the home for $235,000 and spent another $366,000 on renovations before the marriage.
 

 ¶ 7. During the marriage, Suzanne started a business selling Shaklee products. Larry purchased the initial inventory for
 
 *931
 
 the business and periodically contributed cash to keep the business running. Suzanne also earned her real estate license during the marriage. Larry paid the expenses for Suzanne to obtain her education and real estate license. Upon obtaining her license, Suzanne enjoyed success as a real estate agent, eventually earning a six-figure annual income. Suzanne kept her income, rather than contributing financially to the marriage, even though Larry paid Suzanne’s income and self-employment taxes. Suzanne worked for Charlotte Smith Realty, Nix-Tann Realty, and eventually started a business with Brian Fischer selling high-end homes in the Jackson area.
 

 ¶ 8. Larry accused Suzanne of engaging in a long-term affair with Fischer, which Suzanne adamantly denied. Fischer testified at the trial that he and Suzanne engaged in a lengthy romantic relationship while Suzanne and Larry were still married. In fact, Suzanne left Larry and the marital home only one month after Fischer and his wife divorced. Fischer testified that their relationship ended when Suzanne began an affair with another man, Wells Richards. The Chancellor found Suzanne’s testimony denying the affair with Brian untruthful, and he found her tactics inappropriate in falsely claiming that Brian was gay in an attempt to prove no affair occurred.
 

 ¶ 9. Suzanne raises the following issues for our review on appeal, all related to property division and alimony: (1) the chancellor erred in finding that SSC did not appreciate in value; (2) the fifty-percent marketability discount used by the chancellor in valuing SSC was unreasonably high; (3) the chancellor erred in failing to value patents held by 3-Design; (4) the chancellor erred in failing to value Larry’s airplane; (5) the chancellor erred in awarding Suzanne only twenty-five percent of the marital estate; and (6) the chancellor erred in refusing to award alimony to Suzanne.
 

 STANDARD OF REVIEW
 

 ¶ 10. “This Court’s standard of review regarding domestic relations matters is a limited one. We will not disturb the findings of a chancellor unless manifestly wrong, clearly erroneous, or if the chancellor applied the wrong legal standard.”
 
 McKnight v. McKnight,
 
 951 So.2d 594, 595-96 (¶ 5) (Miss.Ct.App.2007). However, we review questions of law de novo.
 
 Oswalt v. Oswalt,
 
 981 So.2d 993, 995 (¶ 5) (Miss.Ct.App.2007).
 

 ¶ 11. Case law governs how chancellors approach property division in divorce cases. Before dividing the couple’s assets, the chancellor should first classify the couple’s assets as either marital or non-marital.
 
 Boutwell v. Boutwell,
 
 829 So.2d 1216, 1221 (¶ 19) (Miss.2002). The supreme court held in
 
 Hemsley v. Hemsley,
 
 639 So.2d 909, 914 (Miss.1994), that “[ajssets acquired or accumulated during the course of a marriage are subject to equitable division unless it can be shown by proof that such assets are attributable to one of the parties’ separate estates prior to the marriage or outside the marriage.” Thus, the chancellor may equitably divide only the marital property.
 
 Messer v. Messer,
 
 850 So.2d 161, 167 (¶ 24) (Miss.Ct.App.2003) (citing
 
 Hemsley,
 
 639 So.2d at 914). Case law also explains that while a spouse’s separate property retains its separate identity during the marriage, “[pjroperty brought into the marriage by one partner and used by the family becomes a marital asset.”
 
 Boutwell,
 
 829 So.2d at 1221 (¶ 19).
 

 ¶ 12. After classifying the parties’ assets as either marital or non-marital, the chancellor should then proceed to equitably divide the property using the
 
 *932
 
 factors set forth by the supreme court in
 
 Ferguson v. Ferguson,
 
 639 So.2d 921, 928 (Miss.1994).
 
 Messer,
 
 850 So.2d at 167 (¶ 25). Finally, the chancellor should examine whether the equitable division of the marital property, considered in light of the non-marital assets, adequately provides for both parties.
 
 Messer,
 
 850 So.2d at 168 (¶ 26). If the distribution of the parties’ assets, including any separate property, fails to adequately provide for the parties, the chancellor then considers whether to award alimony to one of the parties.
 
 Id.
 
 With the above guidelines in mind, we turn to a review of Suzanne’s claimed errors of the property division.
 

 I. Whether the chancellor erred in finding that SSC did not appreciate in value during the marriage.
 

 ¶ 13. In her first two assignments of error, Suzanne contends that the value assigned by the chancellor to SSC constituted error, and she asserts that the incorrect valuation figures caused error in the chancellor assignment of value. Suzanne argues that the chancellor erred in failing to retroactively apply a lack of marketability discount to the 1990 value of SSC, and with respect to the discount applied, she asserts that the business valuation expert used an unreasonably high discount for lack of marketability to the 2005 value.
 

 ¶ 14. Larry alternatively argues that he owned SSC before their marriage, and that she never acquired any interest in the companies. He also claims that no assets of the corporations were commingled with the marital estate, and that SSC, therefore, constitutes his separate property. He also argues that SSC possessed a greater value at the time of the marriage than at that time of valuation on December 31, 2005, and, therefore, no appreciation in the value of the business occurred during the period of the marriage. He submits that since no appreciated value exists, then no value of SSC should be attributed to the marital estate. Larry began SSC in 1969 and acquired 100% ownership in 1986.
 

 ¶ 15. The chancellor disagreed with Larry’s assertion that the companies constituted his separate property, even though Larry owned all the stock before the marriage. The chancellor recognized the law equally values the worthy efforts of a spouse, who, by the parties’ agreement, contributes to the success of the marriage by making a home and providing a supportive environment for the primary income-earner to perform. The chancellor, therefore, found that Suzanne was entitled to an award of equitable division of the marital estate, including the value of the appreciation of Larry’s businesses during the period of the marriage.
 

 ¶ 16. The findings of the chancellor reflect that he acknowledged that the parties agreed to use December 31, 2005, as a valuation date of the businesses,
 
 [1]
 
 including SSC. The parties agreed to allow James Thomas Grantham, a certified public accountant, to evaluate the businesses and provide expert opinion as to the fair market value of the assets. In
 
 Singley v. Singley,
 
 846 So.2d 1004, 1011 (¶ 18) (Miss.2002), the supreme court noted that the fair market value of a business is the “price at which property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts.” The determination of fair market value constitutes a question for the trier of fact, and the Mississippi Supreme Court explained that findings by the trier of fact will be respected when they are
 
 *933
 
 supported by reasonable evidence in the record and are not manifestly wrong.
 
 Allied Steel Corp. v. Cooper,
 
 607 So.2d 113, 118-19 (Miss.1992).
 

 ¶ 17. The findings of the chancellor recognize that much of the dispute between the parties as to the value of SSC per-_ tained to the discount figure applied in the analysis of the 2005 value of SSC. The chancellor considered Suzanne’s assertion that management, namely the chief financial officer, of SSC provided material misrepresentations to the valuation expert resulting in an under-evaluation of market value. The chancellor noted that the alleged misrepresentations related to the balance sheet valuation and the factors considered by Grantham in arriving at what he considered the proper discount rate. After considering the testimony and other evidence, the chancellor found credible and persuasive evidence of only one factual mischaracterization that would have resulted in a higher appraisal of market value by Grantham in the valuation process. The chancellor found that the mischaracterization constituted an error of omission of the value of a lawsuit involving SSC as the party plaintiff asserting a claim on work that SSC performed. The chancellor found the value of the lawsuit, $2,238,442, should be considered in the valuation of SSC.
 

 ¶ 18. The chancellor explained that the valuation expert, Grantham, concluded that the market value of SSC on December 31, 2005, amounted to $2,470,000, as discounted. The chancellor explained that since the valuation expert applied a 50% lack of marketability discount, then 50% of the lawsuit’s value, or $1,119,221, should be added to that value of $2,470,000. The addition of one half of the value of the lawsuit increased the market value of SSC to $3,589,221 on December 31, 2005. The chancellor provided that Larry’s financial statement dated December 31, 1990, just a few months after the marriage showed the value of SSC to be $4,319,276. The court, therefore, found no gain in the value of SSC from the date of marriage.
 

 ¶ 19. Upon review, we find that the business valuation report provided to the court and the parties explains that the opinion of market value is based upon the value of an on-going concern. The report looked at industry conditions as well as the history of the company and the underlying assets. As noted by the chancellor in his findings, the business valuation expert, Grantham, recommended that the chancery court apply a fifty-percent discount for lack of marketability to the 2005 value of SSC due to a variety of changed circumstances. Those circumstances including the following: the company’s lack of marketability based on its inability to obtain bonding for future jobs; SSC’s lack of access to new capital resulting from a lack of bank financing
 
 [2]
 
 and lack of investors; increased industry costs; and information regarding SSC’s profitability after 2005.
 

 ¶ 20. The valuation report also explains that SSC was engaged in four significant lawsuits, and three of the suits involved substantial claims where work had already been performed by SSC. The report reflects SSC stood as a defendant in the fourth suit to recover additional payments.
 
 *934
 
 That suit was eventually settled. The report explains in detail that the discount for lack of marketability refers to the ability or inability of an owner of an asset to affect the sale of that asset due to the presence or lack thereof, of an existing market for that asset. In this situation pertaining to SSC, the report explains that no market for closely held businesses existed that would allow SSC’s interests to be sold effectively in a short period of time. The valuation report concludes that since SSC lacked an active market, by definition, SSC was illiquid. The report reviewed the studies of a marketability
 
 [3]
 
 discounts in determining the lack of marketability discount to apply to SSC. The valuation report found no comparable structural steel contractor transactions and that the discount for lack of marketability fell at the higher end of those set forth in various other studies. The report explained that the lack marketability of SSC resulted in large measure from the inability to get bonding, erosions of profits, lack of access to new capital, and environmental contamination of SSC’s property.
 

 ¶ 21. The report explained that after applying the fifty-percent lack of marketability discount to the value of SSC, that the market value of SSC constituted $2,470,000. The chancellor found that Grantham’s valuation omitted the value of a lawsuit in which SSC stood as the plaintiff. As previously noted, to account for the omitted value of the lawsuit in the market value calculation, the chancellor added $1,119,221
 
 [4]
 
 to Grantham’s estimated value. The chancellor then assigned SSC a final market value of $3,589,221 on December 31, 2005.
 

 ¶ 22. The chancellor acknowledged that the marketability discount created a point of contention between the parties. The chancery court did
 
 not
 
 apply the same fifty-percent lack of marketability discount to the 1990 value of SSC, which Suzanne argues resulted in an “apples and oranges” comparison when determining whether SSC appreciated during the marriage. The record reflects that Danny Thomas, SSC’s chief financial officer provided the information used to determine the 1990 value of the company. Thomas testified that, in his opinion, SSC was worth $4,319,276 in 1990, when the couple married. The contention arose because Thomas applied no such marketability discount to his estimate of SSC’s 1990 value. When the 1990 value supplied by Thomas is subtracted from the 2005 market value determined by the business evaluation expert, Grantham, the calculation shows that SSC depreciated during the marriage. Thus, no portion of SSC’s value constituted a martial asset subject to equitable division.
 

 ¶ 23. However, the valuation report explains why the lack of marketability discount was applied to the 2005 market value, but not to the earlier 1990 market value. The business evaluation shows the discount applied based upon the current conditions impacting current values. The discounts, however, fail to apply retroactively to a time when those market or company conditions warranting the discount failed to exist.
 

 
 *935
 
 ¶24. As stated, both parties agreed to allow Grantham Poole Certified Public Accountants (Grantham Poole) to prepare the business valuation reports. The valuation reports were prepared and provided to both parties on January 16, 2008. Thus, both Larry and Suzanne possessed adequate time to review the reports and prepare questions for trial. Therefore, Suzanne possessed ample opportunity to provide evidence to show why any such discount as to marketability should have applied based upon the conditions existing in 1990.
 

 ¶ 25. In further review of the valuation process, we find that the valuation report explained that the valuation considered the three commonly accepted approaches to determining the fair market value of a closely-held business — the asset-based approach,
 
 [5]
 
 the market-based approach,
 
 [6]
 
 and the income-based approach.
 
 [7]
 
 The report itself states that all three valuation methods were considered. However, the valuation expert found the asset-based approach most suitable for SSC due to the lack of publicly available information and SSC’s reported net losses in the years leading up to the valuation date, and the deteriorated profits of SSC and industry economic decline. The valuation expert, Grantham, also said that he considered the factors enumerated in the Internal Revenue Service Revenue Ruling 59-60
 
 [8]
 
 , which is the commonly used guideline for valuing stock in closely-held corporations.
 
 See
 
 Bell on Family Law, § 8.04[1], In
 
 Adcock v. Mississippi Transportation Commission,
 
 981 So.2d 942, 947 (¶17) (Miss.2008), the supreme court stated the following regarding the determination of fair market value:
 

 Fair market value is an opinion best formed by competent persons pursuing not just one, but three separate and distinct but nevertheless interrelated, approaches to value: the cost approach, the market data or sales comparison approach, and the income approach.... However, all three methods of valuation need not be considered in every appraisal, particularly those of non-commercial property.
 

 (Internal citations and quotation marks omitted). In affirming the trial court’s admittance of the expert testimony, the Court in
 
 Adcock
 
 explained that the expert’s testimony was based on an established method, not speculation, and that the expert’s opinion was subject to cross-examination.
 
 Id.
 
 In this case, the report contained specific data and explanations of how Grantham valued SSC, which we find adequately support the chancellor’s valuation of SSC. We will now briefly summarize the evidence contained in the report.
 

 
 *936
 
 ¶ 26. The valuation report reviewed the economic outlook nationally and acknowledged, among other things, that an increase in the cost of construction materials was widely reported. Further, the report examined the economic outlook for the structural steel industry in particular, finding that the industry was extremely competitive and SSC suffered extreme financial stress in the years 2003, 2004, and 2005. With an unexpected increase in costs, SSC was slow to adjust its bids on new jobs to reflect the expensive materials. Consequently, SSC under-bid jobs and their forecasted profits eroded significantly. SSC’s deteriorating financial position affected its ability to obtain capital. SSC also struggled to obtain bonding to cover new jobs and then faced inability to obtain bonding or access to new capital. SSC operated at a net loss in the years prior to the valuation date.
 

 ¶ 27. Further, Grantham explained that the report based the lack of marketability discount that applied to SSC’s value on its current conditions related to lack of marketability of its ongoing business concern. The report states that no market for closely held businesses existed that would allow SSC’s interests to be sold effectively in a short period of time. Since SSC lacked an active market as of the 2005 valuation date, it was, according to Grantham, illiquid. Relying on studies pertaining to marketability discounts, SSC’s inability to obtain bonding for new jobs, the erosion of SSC’s profits on jobs subsequent to the valuation date, and SSC’s lack of access to new capital all contributed to a lack of marketability for SSC. Furthermore, environmental contamination of a portion of SSC’s property raised additional concerns for SSC’s marketability. Based on all the factors before him, Grantham recommended a fifty-percent lack of marketability discount be applied to the initial value of SSC.
 

 ¶ 28. Larry’s testimony painted a similar picture regarding both the company and the industry conditions that was consistent with Grantham’s findings in his valuation report. Larry testified that SSC was “out of juice at the bank.” He testified that SSC experienced difficulty meeting its payroll obligations, and that he failed to find any investors to put money into SSC. By comparison, Larry testified that SSC’s financial outlook in 1990 was positive, with no banking problems and continued access to bonding. He explained that in 1990 SSC was engaged in plentiful work and was profitable.
 

 ¶ 29. Because the fair market value of a business is a question for the trier of fact, in this case, the chancellor, we defer to the chancellor’s findings of fact when supported by the evidence and not manifestly wrong.
 
 Allied Steel,
 
 607 So.2d at 118-19. Based on the foregoing, we find substantial evidence in the record to support the chancellor’s valuation of SSC and to support the chancellor’s application of the fifty-percent lack of marketability discount to the 2005 value of the company without applying that same discount retroactively to the 1990 value of the company. Therefore, Suzanne’s assertion of error in the chancellor’s valuation of SSC lacks merit.
 

 II. Whether the chancellor erred in omitting the value of patents from the valuation of 3-Design.
 

 ¶ 30. Grantham, the C.P.A., also appraised 3-Design, Larry’s software company related to structural steel businesses. Grantham assigned 3-Design a negative value of $12,994. 3-Design, which earns revenue of $100,000 per year, holds intellectual property patents. Grantham elected not to include the patents in his valuation of 3-Design because, in his view, the patents are intangible assets and are in-
 
 *937
 
 eluded in the supreme court’s definition of goodwill, which cannot be used in the valuation of fair market value of a business. So, the valuation report provided to the parties reflected that no value had been assigned to the patents, and then at trial, we note that Suzanne failed to provide the chancellor with any evidence as to value attributable to the patents for the chancellor to consider. Grantham states the following in his report:
 

 Under Mississippi case law, goodwill is not included in the marital estate. Court cases such as
 
 Singley v. Singley,
 
 846 So.2d 1004 (Miss.2002) and
 
 Yelverton v. Yelverton,
 
 961 So.2d 19 (Miss.2007) set forth the Court’s position. “Goodwill is simply not property and thus cannot be deemed a divisible marital asset in divorce” (Singley). In
 
 Sing-ley,
 
 the Court goes on to state, “It (goodwill) is a value that exceeds the value of the physical building housing the business and the fixtures within the business.” By focusing on physical assets, this definition appears to expand the accounting definition of goodwill to include all intangible assets other than goodwill in fair market value of businesses subject to division in divorce, our valuation would need to be revised. Based on the case law, we have excluded goodwill and other intangible assets from the determination of the fair market value of the member’s equity of the Company.
 

 ¶ 31. Suzanne asks this Court for clarification of whether intellectual property such as patents and copyrights may be part of a marital estate. If intellectual property may be considered part of a marital estate, Suzanne requests this Court to reverse and remand for a valuation of the patents owned by 3-Design.
 

 ¶ 32. Suzanne’s assignment of error is misplaced. First, the chancellor failed to find or state that intellectual property could not be considered when assessing the fair market value of the business. While the valuation expert excluded the values of the patents from the valuation of 3-Design, the chancellor provided clearly in his opinion that he received no evidence as to the value, if any, of the patents for his consideration. The chancellor stated:
 

 Mr. Grantham concludes that as of December 31, 2005, Larry’s 50% ownership in this business had a negative value of (-$12,944), which is to say no value. Suzanne points out that he acknowledged that his opinion did not take into account the value of the list of patents held by the company and listed on Trial Exhibit 24. The exhibit does not purport to assign any values to these patents, and, as Larry pointed out in his testimony, some were not even renewed. The exhibit indicates, in fact, that four such patents were not going to be renewed, and that two others were inactive. Be that all as it may, the fact remains that there is no information upon which the Court can conclude otherwise than that there is no value to this entity.
 

 Because no other evidence was presented to show the value of the patents, the chancellor, in his discretion, accepted the value of 3-Design provided by the valuation expert. In
 
 Irby v. Estate of Irby,
 
 7 So.3d 223, 235 (¶ 38) (Miss.2009), the supreme court affirmed a chancellor’s valuation of a husband’s separately owned business based on the husband’s testimony alone. The supreme court stated:
 

 The only evidence presented to the trial court as to the value of the Back Clinic was the uncontroverted testimony of Henry. The chancellors of this state are not responsible for the evidence that is presented at trial. As the Court of Appeals has said, it is incumbent upon the parties, and not the chancellor, to pre
 
 *938
 
 pare evidence touching on matters pertinent to the issues to be tried. Where a party fails to provide information, the chancellor is entitled to proceed on the best information available. The value of the Back Clinic was a factual finding supported by credible evidence.
 

 Id.
 
 (internal citations and quotation marks omitted).
 

 ¶ 33. We find that the record provides substantial support for the chancellor’s valuation of 3-Design. Therefore, Suzanne’s assignment of error is without merit.
 

 III. Whether the chancellor erred in finding that Larry’s plane had no value as a marital asset.
 

 ¶ 34. Larry purchased a 1978 Grumman airplane in 1992 that was placed in a holding company, Cougar. He purchased this airplane with his separate funds. The chancellor found that the airplane constituted a depreciating asset, and therefore he found that the airplane’s value had not appreciated in value during the course of the marriage. The chancellor concluded that the plane, and the separate holding company, Cougar, constituted Larry’s separate property and that the asset “has no value as a marital asset.” The record reflects that the parties stipulated to the underlying value of Cougar, representing the value of the airplane. Any appreciation in value of that asset, had any existed, would have been considered marital property.
 

 ¶ 35. Therefore, we find no abuse of discretion in the chancellor’s finding as to this asset.
 

 IV. Whether the chancellor erred in awarding Suzanne only twenty-five percent of the marital estate.
 

 ¶ 36. Suzanne next argues that the chancellor erred in awarding her only twenty-five percent of the marital estate. Suzanne contends that the chancellor incorrectly applied the Ferguson
 
 [9]
 
 factors by (1) giving too much weight to Larry’s direct financial contribution to the accumulation of assets while ignoring Suzanne’s indirect contributions; (2) considering Suzanne’s spending habits without considering Larry’s spending; (3) overemphasizing Suzanne’s affair with Brian Fischer; and (4) taking into consideration Larry’s obligation for debt that had already been used to discount the value of the marital estate.
 

 ¶ 37. In his written opinion, the chancellor analyzed each of the
 
 Ferguson
 
 factors and applied them to the facts of this case. The supreme court enumerated eight factors for chancellors to consider when making an equitable distribution of marital property. Those factors are as follows:
 

 1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
 

 a. Direct or indirect economic contribution to the acquisition of the property;
 

 b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
 

 c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
 

 2. The degree to which each spouse has expended, withdrawn or otherwise
 
 *939
 
 disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.
 

 3. The market value and the emotional value of the assets subject to distribution.
 

 4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
 

 5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
 

 6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;
 

 7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,
 

 8. Any other factor which in equity should be considered.
 

 Id.
 
 We limit our discussion of the chancellor’s
 
 Ferguson
 
 analysis to address only those factors which Suzanne claims the chancellor improperly applied.
 

 1. Substantial contribution to the accumulation of marital assets.
 

 ¶ 38. The court in
 
 Ferguson
 
 instructed chancellors to consider both the direct and indirect contributions of the parties to the accumulation of marital assets. The chancellor noted that the assets in the marital estate came predominantly through Larry’s efforts. Larry enjoyed great financial success through his business ventures prior to his marriage to Suzanne. The chancellor noted under this factor that Suzanne and Larry had help with housekeeping and lawn maintenance during the marriage. Further, in the later years of the marriage, Suzanne earned a sizable income, which she used entirely for herself, in addition to the monthly allowance Larry provided for her personal expenses and household needs. Despite Suzanne’s assertions that the chancellor ignored her indirect contributions to creating a valuable marital estate, the chancellor clearly stated in his opinion that he considered her contributions. The chancellor stated:
 

 There is no question but that Larry’s and Suzanne’s marital estate has been accumulated largely through Larry’s efforts. Larry was well-established, and successful, in his business pursuits before he and Suzanne married. Suzanne, on the other hand, was the owner of a failed business and had a negative net worth at the time of the marriage. None of that is said to denigrate Suzanne’s contributions to the success of the marriage for the time that it might be considered to have been a success or to minimize the extent to which she was a help-mate and company to Larry while they were home in the evening or traveling. But, as Larry points out, they had cleaning help at home and a yardman, and Suzanne was not required to do much in the way of homemaking. She not only spent all the money she made on herself, over $200,000 in some years, but Larry gave her a sum monthly above and beyond that just for her own personal needs. Moreover, Larry paid for everything around the house, including groceries. There is no doubt that when Suzanne and Larry were happy together, in the early years of their marriage, she probably contributed to his mental health in such a way as to enhance his job performance while work
 
 *940
 
 ing, and our appellate courts have indicated that there is certainly value to be attributed to that indirect contribution to the building of the marital estate. However, the Court finds on the evidence that was presented that Suzanne’s contributions to the acquisition of the marital estate were relatively minimal.
 

 ¶ 39. The chancellor clearly considered the direct and indirect contributions to the accumulation of Larry’s and Suzanne’s marital assets and found that Suzanne’s indirect contributions were minimal. This Court recognizes that a homemaker’s indirect contributions to the accumulation of assets during a marriage are presumed equal to those of the spouse making direct financial contributions to the marriage.
 
 Hemsley v. Hemsley,
 
 639 So.2d 909, 915 (Miss.1994). The presumption may be rebutted by showing that the nonworking spouse’s indirect efforts did not substantially contribute to the accumulation of assets.
 
 Chamblee v. Chamblee,
 
 637 So.2d 850, 864 (Miss.1994).
 

 ¶ 40. In
 
 Redd v. Redd,
 
 774 So.2d 492, 496 (¶ 15) (Miss.Ct.App.2000) this Court reversed a chancellor’s judgment for a failure to include certain assets in the marital assets to be divided among the parties. Mary Lu Redd sought a divorce from her husband Gordon Redd on the ground of habitual cruel and inhuman treatment.
 
 Id.
 
 at 493 (¶ 1). Mary Lu had quit her teaching job early in the marriage to work in Gordon’s newly formed timber business.
 
 Id.
 
 at 493 (¶ 2). When their fourth child arrived, Mary Lu and Gordon decided that she would stay at home and rear the children.
 
 Id.
 
 The chancellor awarded Mary Lu approximately twenty-three percent of a nearly $5 million estate.
 
 Id.
 
 at 494 (¶ 5). In reversing for failure to include assets in the marital property, this Court noted that Mary Lu’s receiving such a low percentage of the marital estate did not itself constitute grounds for reversal.
 
 Id.
 
 at 496 (¶ 15). This Court stated the following:
 

 We reverse this case and instruct the chancellor on remand to reconsider the distribution of marital assets to Mary Lu in light of the valuation error, keeping in mind the guidelines set forth in Ferguson. We do not address whether the chancellor’s distribution to Mary Lu was equitable since we do not yet know what portion of the discrepancy in the valuation the chancellor will award on remand.
 
 We note, however, in light of the highly deferential standard of review, that twenty-three percent of the total estate, standing alone, is not grounds for reversal.
 
 This is especially true since the assets awarded to Mary Lu were of the type that would be easy to liquidate, while Gordon received ongoing business concerns together with total responsibility for the liabilities attached thereto.
 

 Id.
 
 (emphasis added).
 

 ¶ 41. Further, the chancellor considered Suzanne’s direct and indirect contributions to the acquisition of marital assets lessened even further by her significant contributions to the breakdown of the marriage. The chancellor cited Suzanne’s abandonment of her role as homemaker and her affair with Fischer as factors he considered in assessing her contribution to the marital estate. When assessing the parties contributions to the stability and harmony of the marriage, the chancellor stated:
 

 [I]n the early years of the marriage the parties cooked together and traveled together, and they appear to have contributed more or less equally to the stability and harmony of their relationship. It was after Suzanne began to work in the real estate business that she started spending more and more time away from home, eventually spending day and
 
 *941
 
 •night with Brian Fisher [sic], very frequently coming home late at night after a day’s work and an evening of drinking. According to Larry’s testimony, which was largely undisputed by Suzanne, she began to neglect what few homemaking duties she had engaged in as she turned her attention outside the home. Suzanne and Larry became more and more distant in their relationship at this point, conjugal relations ceased, and Larry testified that he felt Suzanne slipping away. Larry tried to resurrect the relationship by getting the couple into counseling, but that didn’t work either. Unfortunately, the Court must conclude on the basis of the limited indirect contribution made by Suzanne to the actual accumulation of the marital estate referenced above and the decreasing quantity and quality of the time she spent devoted to the couple’s relationship as just mentioned, that the sum total of her contribution to the marital estate was relatively minimal.
 

 ¶ 42. Further, regarding the parties’ direct and indirect contributions to the accumulation of assets, the chancellor noted that Larry established his businesses and achieved success
 
 prior to
 
 the marriage. Thus, Suzanne “had nothing to do” with the training or education leading to his success. Conversely, the chancellor noted the contributions that Larry made to Suzanne’s success in business. Larry paid off Suzanne’s debt incurred as a result of a failed business Suzanne owned prior to the marriage. He purchased inventory and helped Suzanne start her Shaklee business, helping her find customers among his friends and associates. Finally, the chancellor noted, Larry paid for Suzanne’s education and license to become a real estate agent, enabling her personal financial success and skilled income earning potential.
 

 ¶ 43. We find the chancellor acted within his discretion in determining that Suzanne’s direct and indirect contributions to the accumulation of the marital assets were “minimal.” The supreme court in
 
 Ferguson
 
 instructed chancellors that they may indeed consider factors such as the parties’ contributions to the stability of the home, support of the other spouse in obtaining education and career training, as well as direct financial contributions to the marital estate.
 
 Ferguson,
 
 639 So.2d 921, 928 (Miss.1994). Further, as to Suzanne’s affair with Fischer, we note that the chancellor acted within his discretion in considering fault in the breakdown of the marriage when determining how to equitably divide the martial estate.
 
 See Brabham v. Brabham,
 
 950 So.2d 1098, 1101-02 (¶ 10) (Miss.Ct.App.2007). We find that the evidence and testimony presented at trial substantially supports the chancellor’s findings that Suzanne made minimal direct or indirect contributions to the accumulation of marital assets. Therefore, we find no merit to this assignment of error.
 

 2. Whether the chancellor overemphasized Suzanne’s spending habits while downplaying Larry’s spending habits.
 

 ¶ 44. Suzanne’s next argument centers on the chancellor’s treatment of the second
 
 Ferguson
 
 factor, the extent to which each spouse has expended, withdrawn, or otherwise disposed of marital assets. Relative to this factor, the chancellor discussed Suzanne’s “excessive spending habits,” which developed around the time that the marriage began to falter. The chancellor relied on Larry’s and Suzanne’s testimony that Suzanne spent, for her own use, $200,000 which Larry entrusted to her in order to protect assets in the event of further business failings. Larry testified that he made clear to Suzanne that she should save the money for their future mutual benefit, rather than spend the money. The chancellor found
 
 *942
 
 that “such expenditure by Suzanne, especially in view of the fact that she had not only her own substantial income to spend solely on her personal needs and desires but also a monthly stipend from Larry, was an unreasonable dissipation of the marital estate. The Court will attribute such funds to Suzanne in the distribution of the estate.”
 

 ¶ 45. Suzanne asserts that Larry spent approximately $200,000 per year of marital income on his personal assets which retained no value at the time of the separation. However, the chancellor’s opinion, when read as a whole, shows that the only funds credited against Suzanne’s share of the marital assets was the $200,000 Larry entrusted to her for safekeeping, and which she admittedly spent for her own personal use.
 

 ¶ 46. The chancellor’s discussion of Suzanne’s spending focused on Suzanne’s retaining her entire income for her personal use, rather than contributing it to the marriage. While retaining the entirety of her own income, Suzanne continued to receive and spend the stipend, $2,000 monthly, from Larry for her personal use. Although Larry spent money on personal expenses as well as business ventures, he also contributed the income he earned to the marital estate.
 
 [10]
 
 The trial testimony shows that Larry took care of the couple’s finances, including maintenance on the home, insurance, taxes, etc. Thus, Larry contributed his income to the benefit of the marriage, while Suzanne retained her income entirely for her own personal use. The chancellor acted within his discretion when considering the couple’s spending habits, especially Suzanne’s spending, when determining how to equitably distribute the couple’s assets. This issue lacks merit.
 

 3. Any other factor which in equity should he considered.
 

 ¶ 47. In her last assignment of error regarding the property division, Suzanne argues that the chancellor erred by considering that Larry remained personally liable for the debt associated with the businesses, because the chancellor took that debt into consideration and used it to reduce the current value of the businesses. The chancellor stated, “[w]hile the Court has found the appreciation in value of the businesses to be a part of then [sic] marital estate, Suzanne will enjoy an award of her portion of same free from debt, which fact, when balanced with the other
 
 Ferguson
 
 factors herein, justifies a somewhat smaller award to her.”
 

 ¶ 48. Suzanne’s argument on this point of error is simply, “it seems unfair” to reduce the marital estate because of the debt owed by the businesses, and then to reduce Suzanne’s share of the marital estate because of the debt. However, the chancellor merely stated that he saw fit to give Suzanne a “somewhat smaller” award based on Larry’s continued personal liability for the debt. We find no abuse of discretion in the chancellor’s judgment to award Suzanne a smaller share of the marital estate, especially when combined with the chancellor’s other considerations.
 
 [11]
 

 ¶ 49. This issue lacks merit.
 

 
 *943
 
 V. Whether the chancellor erred in not awarding alimony to Suzanne.
 

 ¶ 50. In her final assignment of error, Suzanne contends that the chancellor’s judgment not to award alimony constitutes reversible error. Specifically, Suzanne argues that the chancellor overlooked that at the time of the judgment, Suzanne was unemployed, experienced health problems, had exhausted the $296,000 in her accounts, and had placed her real estate license on inactive status because of her inability to pay for professional insurance.
 

 ¶ 51. In
 
 Armstrong v. Armstrong,
 
 618 So.2d 1278, 1280 (Miss.1993), the Mississippi Supreme Court delineated twelve factors for chancellors to consider when making a determination whether or not to award alimony. The twelve factors are:
 

 1. The income and expenses of the parties;
 

 2. The health and earning capacities of the parties;
 

 3. The needs of each party;
 

 4. The obligations and assets of each party;
 

 5. The length of the marriage;
 

 6. The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;
 

 7. The age of the parties;
 

 8. The standard of living of the parties, both during the marriage and at the time of the support determination;
 

 9. The tax consequences of the spousal support order;
 

 10. Fault or misconduct;
 

 11. Wasteful dissipation of assets by either party; or
 

 12.Any other factor deemed by the court to be “just and equitable” in connection with the setting of spousal support.
 

 Id.
 

 ¶ 52. The chancellor thoroughly discussed each factor in his amended opinion and ultimately found Suzanne not entitled to alimony. We find substantial evidence in the record to support the chancellor’s findings relative to alimony. In reaching his conclusion, the chancellor, despite Suzanne’s assertions to the contrary, examined both Suzanne’s and Larry’s circumstances under the applicable
 
 Armstrong
 
 factors.
 

 ¶ 53. First, the chancellor noted that Suzanne created a successful business for herself, earning a high income. The chancellor additionally noted that the real estate market suffered during the economic downturn; however, noted the chancellor, the steel industry also suffered a downturn. Based on both Suzanne’s and Larry’s ability to manage money and live within their means, the chancellor found that Suzanne could more than adequately support herself in the future without alimony payments from Larry.
 

 ¶ 54. Further, the chancellor considered both Larry’s and Suzanne’s health conditions. Larry suffered from serious heart problems, undergoing bypass surgery the year before the separation. He was sixty-five years old at the time of the divorce. Suzanne was only fifty-four, and according to the chancellor, appeared to be in good health. Suzanne argues that her health conditions prevent her from earning the same income she once earned during the marriage. However, the chancellor found that Suzanne lacked credibility on
 
 *944
 
 this point. He stated in his opinion: “At trial Suzanne attempted to portray herself as afflicted with various medical complaints and thus unable to continue to work; however, there really was no evidence produced to substantiate such claims, and the Court noted her quick wit, vivacious interaction with all involved in the court proceedings, and believes that she is more than capable of re-entering the woi'kforce to support herself.”
 

 ¶ 55. The chancellor reiterated his earlier findings under the marital fault and dissipation of assets factors. The evidence in the record supports the chancellor’s findings under these factors in determining that Suzanne should not receive alimony.
 

 ¶ 56. The most telling aspect of the chancellor’s
 
 Armstrong
 
 analysis is his discussion under the twelfth factor, regarding any other factor applicable in the chancellor’s determination. Under this factor, the chancellor stated that “Suzanne was not truthful either with Larry or with the Court. It is clear that she had an ongoing affair with Brian Fisher [sic] for years before she and Larry separated; she abandoned the marriage when Larry was not only suffering serious business reversals but also very serious health problems. Inasmuch as Suzanne is a relatively young woman, educated, trained, experienced and more than capable of making a very good living for herself, and awarded a portion of this marital estate which the Court finds is commensurate with the contribution she made to the marriage and to the accumulation of the marital estate during the period these parties were married and living together, the Court does not find that she is entitled to any award of alimony.”
 

 ¶ 57. Suzanne’s argument that the chancellor erred in not awarding her alimony is without merit.
 

 CONCLUSION
 

 ¶ 58. Because appellate courts defer to a chancellor’s findings of fact, we may only reverse a chancellor if his findings are manifestly wrong, clearly erroneous, or if the chancellor applied an inappropriate legal standard. In this case, we find substantial support in the record for the chancellor’s findings regarding the value of the marital estate, nrarket value of the businesses including SSC, the property division, and the alimony determination. The chancellor properly considered the facts of the case under the appropriate legal standards, and his findings of fact will not be disturbed.
 
 See id.
 
 Therefore, we affirm the judgment of the chancellor.
 

 ¶ 59. THE JUDGMENT OF THE CHANCERY COURT OF HINDS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. MYERS, P.J., NOT PARTICIPATING.
 

 [1]
 

 . The record shows that the parties stipulated to the value of some of their assets.
 

 [2]
 

 . The valuation report explained that the company’s financial position had deteriorated, and that its primary lender became concerned over the company’s viability. The company’s loans were then placed on a non-accrual status by the lender. In the third quarter of 2004, the bank hired a firm to explore options for shifting exposure on the loans and then SSC retained this same firm to assist in seeking additional capital and debt and equity partners. Unfortunately the report said that the firm had been unsuccessful in generating any interest in SSC.
 

 [3]
 

 . The report acknowledged that numerous studies had been performed during the past thirty-five years to determine the average levels of discounts for lack of marketability. However, these studies fell into two main categories of restricted stock studies and studies of transactions in closely held stocks prior to, initial public offerings (IPOs).
 

 [4]
 

 . The chancellor found that the value of the lawsuit was $2,238,442. After applying the fifty-percent lack of marketability discount, he arrived at a value of $1,119,221 for the lawsuit.
 

 [5]
 

 . The asset-based approach measures the value of a business based on the net value of the tangible and intangible assets. Bell on Mississippi Family Law § 8.04[2][a].
 
 See also Yelverton v. Yelverton,
 
 961 So.2d 19, 30 (Miss.2007) (holding that goodwill may not be included in a business valuation for property division incident to a divorce).
 

 [6]
 

 . The market-based approach determines the value of a business based on the sale of comparable businesses. Bell, § 8.04[2][b],
 

 [7]
 

 . The income-based approach values a business based on an estimate of the company's future earnings. Bell, § 8.04[2][c].
 

 [8]
 

 .The factors set forth in Revenue Ruling 59-60 for valuing a closely-held corporation are as follows: (a) the nature and history of the business; (b) the economic outlook of the business and the industry in general; (c) the book value of the stock and the financial condition of the business; (d) the company's earning capacity; (e) the business's dividend-paying capacity; (f) the company’s goodwill or other intangible value; (g) the stock sales and the size of the block of stocks to be valued; (h) the market price of stocks in similar companies. Rev. Rui. 59-60, 1959 C.B. 237.
 

 [9]
 

 .
 
 Ferguson,
 
 639 So.2d at 928.
 

 [10]
 

 .
 
 See Rush
 
 v.
 
 Rush, 932
 
 So.2d 800, 807-08 (¶ 25) (Miss.Ct.App.2005) (holding in alimony determination that wife's four failed business ventures, all known to husband, as well as one-time loss of $10,000 in stock trading did not constitute a dissipation of marital assets. The husband knew of the wife's ventures and approved),
 
 rev'd in part on other grounds,
 
 932 So.2d 794 (Miss.2006).
 

 [11]
 

 .
 
 See Bumpous v. Bumpous,
 
 770 So.2d 558, 560-61 (¶ 13) (Miss.Ct.App.2000). In
 
 Bum-pous,
 
 this Court affirmed a chancellor’s award of rehabilitative alimony to a wife who received a heavily debt-laden business in the
 
 *943
 
 chancery court's equitable division of property. The chancellor gave sole responsibility for the debt to the wife, but ordered the husband to pay alimony for forty-four months, which coincided with the time required to pay off the loan balance.
 
 Id.