# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-00424-COA

**JULIA WALKER DAUENHAUER**                                              **APPELLANT**

**v.**

**STEVEN DAUENHAUER**                                              **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/24/2017 |
| TRIAL JUDGE: | HON. JAMES B. PERSONS |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | EDWARD GIBSON |
| ATTORNEY FOR APPELLEE: | CLEMENT S. BENVENUTTI |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 11/13/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE IRVING, P.J., CARLTON AND GREENLEE, JJ.

### CARLTON, J., FOR THE COURT:

¶1.     The Hancock County Chancery Court granted Steven and Julia Dauenhauer a divorce based the ground of irreconcilable differences. The chancellor also distributed the marital property and awarded Steven rehabilitative alimony.

¶2.     Julia now appeals the chancellor's judgment, arguing that: (1) the chancellor erred in awarding Steven rehabilitative alimony; (2) the chancellor erred in determining the date of the end of the accumulation of marital assets; (3) the chancellor erred in his classification of Julia's retirement accounts as marital property; and (4) the chancellor erred in awarding attorney's fees to Steven. Finding error only with the portion of the chancellor's judgment ordering Julia to pay Steven's attorney's fees, we affirm in part and reverse and render in

part.

**FACTS**

¶3.     Julia and Steven first married in 1981.  The marriage produced two children.  In 2001, Julia and Steven obtained a divorce based on irreconcilable differences.   The couple eventually reconciled and remarried in November 2003.  At the time of their remarriage, Julia worked as a registered nurse at Hancock Medical Center and Steven worked as a recreation specialist at the Seabee Base in Gulfport, Mississippi.

¶4.     During their second marriage, Julia returned to school and obtained a Bachelor of Science degree in Nursing in 2011 and a Master of Science degree in Nursing in 2012.  Julia also obtained a nurse practitioner's license in 2013.  In 2006, Steven changed career paths and became an associate pastor at a church.  Steven was eventually laid off due to the church's financial difficulty, and in 2013 and part of 2014, he worked as an outside plant technician for AT&T.  In 2014, Steven obtained employment as a school bus driver and character education teacher for the Hancock County School District.

¶5.     Steven and Julia separated on April 30, 2015.  At this time, both children had reached the age of adulthood.  On May 1, 2015, Julia moved out of the marital home located at 919 Combel Street, Waveland, Mississippi and into a new home.

¶6.     On August 12, 2015, Steven filed a complaint for separate maintenance, asserting that his income was insufficient to pay the normal and usual expenses of maintenance on the marital domicile.  In his complaint, Steven claimed that Julia abandoned him and that he was without fault for the separation.  Steven also requested attorney's fees, explaining that he

lacked sufficient income to pay for his attorney.

¶7. On September 9, 2015, Julia filed her answer to Steven's complaint, denying that she abandoned Steven and alleging that Steven's actions and behavior significantly contributed to their separation. Julia asserted that Steven was "painfully underemployed by his own choice and that his refusal to work, among numerous other factors, substantially eroded the marital relationship and caused the separation of the parties." Julia also filed a counter complaint for divorce, asserting that she was without fault for the separation and seeking a divorce on the ground of habitual cruel and inhuman treatment, or, in the alternative, irreconcilable differences. Julia further requested that the marital home located at 919 Combel Street be placed on the market for sale or be refinanced by Steven in his name only, with the proceeds utilized first to pay for any current outstanding indebtedness and the net proceeds being equally divided by the parties.

¶8. The chancellor heard arguments from the parties regarding Steven's complaint for separate maintenance. The parties reached a temporary agreement as to separate maintenance and the marital property, and on September 11, 2015, the chancellor ratified an order of temporary relief memorializing the parties' agreement on the issues.

¶9. On January 28, 2016, Steven filed his answer to Julia's counter complaint for divorce. Steven moved to dismiss the complaint pursuant to Mississippi Rule of Civil Procedure 12(b)(6), alleging that Julia failed to state a claim against him upon which any relief may be granted. Steven also argued that Julia was without clean hands and therefore should not be granted any of the relief sought in her counter complaint for divorce.

3

¶10. The chancellor held a trial on the matter on May 12, 13, and 16, 2016. During the trial, Steven and Julia reached an agreement to withdraw the fault pleadings and consented to a divorce on the ground of irreconcilable differences. The parties reserved the following issues for the chancellor's determination: (1) Identify marital property and equitably divide the same; (2) Identify the marital debt and equitably divide the responsibility for paying same; (3) Determine the amount of award of attorney's fees from Julia to Steven, if any; and (4) Determine if Steven is entitled to an award of alimony of any kind or nature and award him the same if appropriate.

¶11. The trial then resumed. As the trial recessed for lunch, the chancellor observed that Steven failed to mention "the issue of spousal support" in any of Steven's pleadings. At the chancellor's suggestion, Steven's counsel made an ore tenus motion to amend his answer to Julia's counter complaint and request that Steven be granted spousal support of "whatever kind or nature the [c]ourt deems appropriate" and that Steven be awarded attorney's fees. The chancellor granted the ore tenus motion and requested the details of the motion be included in the consent to adjudicate.

¶12. After hearing testimony, the chancellor advised the parties that, "the date for determining equitable distribution, in my view, should be the date of the temporary order"— September 11, 2015. The chancellor also directed the parties to make post-trial submissions to aid in his consideration of the issues.

¶13. On December 2, 2016, the chancellor entered a judgment granting the divorce on the ground of irreconcilable differences. In his judgment, the chancellor applied the *Ferguson*

4

factors and set forth his equitable division of the marital property. The chancellor then applied the *Armstrong* factors and ultimately awarded Steven rehabilitative alimony.

¶14. Over the next few months, Steven and Julia filed several motions requesting that the chancellor amend his judgment, which we discuss at length later in this opinion. The chancellor entered an amended judgment of divorce on February 24, 2017. Aggrieved, Julia filed a notice of appeal on March 24, 2017, wherein she stated that she is appealing from the final amended judgment entered on February 24, 2017 and the chancellor's February 24, 2017 order denying Julia's motion for amended judgment notwithstanding the verdict, or, in the alternative, for new trial.[1] After Julia filed her notice of appeal, the chancellor addressed a pending motion filed by Steven and issued a second amended judgment of divorce on April 17, 2017.

**DISCUSSION**

### I.    Rehabilitative Alimony

¶15. Julia argues that the chancellor erred in awarding Steven rehabilitative alimony in the amount of $2,000 per month for 48 months, for a total of $96,000. Julia specifically argues that the chancellor erred in his application of the *Armstrong* factors and thus erroneously awarded Steven alimony. Julia maintains that the chancellor erred in his determination of Steven's monthly expenses, specifically Steven's monthly payments for the marital home. Julia also asserts that the chancellor awarded Steven $98,788.09 of the marital estate and

---

[1] An order denying Julia's motion for an amended judgment notwithstanding the verdict, or, in the alternative, a new trial, does not appear in the record. The record does contain a February 24, 2017 order addressing Julia's motion to reconsider the judgment of divorce and Steven's motion to correct the judgment.

awarded Julia $98.668.11; however, the chancellor assigned Julia $58,860.85 in debt but assigned Steven only $21,858.79. Julia claims that because Steven was not destitute, the record does not support an award of rehabilitative alimony. Julia also argues that Steven testified at trial that he chose to remain underemployed.

¶16. When reviewing an alimony award, we "will not disturb a chancellor's findings regarding the award . . . unless there is manifest error." *Larson v. Larson*, 192 So. 3d 1137, 1141 (¶11) (Miss. Ct. App. 2016). "Mississippi precedent establishes that the chancellor's award of alimony is a matter primarily within the discretion of the chancery court because of its peculiar opportunity to sense the equities of the situation before it." *Serio v. Serio*, 203 So. 3d 24, 28 (¶10) (Miss. Ct. App. 2016) (internal quotation marks omitted).

¶17. Chancellors utilize the following factors set forth by the Mississippi Supreme Court when determining an award of alimony:

1. The income and expenses of the parties;

2. The health and earning capacities of the parties;

3. The needs of each party;

4. The obligations and assets of each party;

5. The length of the marriage;

6. The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;

7. The age of the parties;

8. The standard of living of the parties, both during the marriage and at the time of the support determination;

6

9.     The tax consequences of the spousal support order;

10.    Fault or misconduct;

11.    Wasteful dissipation of assets by either party; or

12.    Any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.

*Branch v. Branch*, 174 So. 3d 932, 944 (¶49) (Miss. Ct. App. 2015) (quoting *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993)).

¶18.   We recognize that "rehabilitative alimony provides for a party who is trying to become self-supporting and prevents that party from becoming destitute while searching for a means of income. Moreover, the primary purpose of rehabilitative alimony is to give the former spouse the opportunity to enter the work force." *Id.* at 944-45 (¶50) (internal quotation marks omitted).

¶19.   At trial, the chancellor heard testimony regarding Julia's decision to return to school after the parties remarried. Julia earned her Bachelor of Science degree in Nursing in 2011 and a Master of Science degree in Nursing in 2012, and she later obtained a nurse practitioner's license in 2013. Julia's advanced degrees resulted in her salary increasing from $36,497 in 2011 to $106,435 in 2014.

¶20.   Steven also testified that in 2006, he left his job as a recreation specialist, where he earned approximately $37,000, and became an associate pastor. Steven testified that in 2011, he earned $40,828 while he was employed as an associate pastor. Steven was eventually laid off due to the church's financial difficulty, and he worked as an outside plant technician for AT&T. In 2014, Steven obtained employment as a school bus driver and character education

7

teacher for the Hancock County School District. Steven testified that his income for 2013 was $17,542 and his income for 2014 was $25,146.

¶21.    Steven also testified that he possessed a bachelor's degree in professional aeronautics. He stated that while he did not currently possess a teaching license, he would have to go back to school for "probably . . . a year or a year and a half" to become certified.  Steven also testified that he possessed a commercial driver's license.  During cross-examination, Julia's attorney asked Steven, "[Y]ou choose to remain underemployed, don't you?"  Steven responded, "I choose to do what I'm doing, yes, sir."

¶22.    In his December 2, 2016 judgment, the chancellor performed an equitable distribution of Steven and Julia's marital property.  The chancellor then considered the *Armstrong* factors to determine whether an award of alimony was appropriate.  In applying the *Armstrong* factors, the chancellor held as follows:

> This is a relatively long term marriage and it is also the parties' second marriage. . . . [B]oth parties are in good health with the exception of Steven's hearing loss.  Based on the equitable distribution analysis above, each party has a house and vehicles to maintain, as well as student loan debts to pay. Julia has a much higher earning capacity than she did at the beginning of the marriage, and currently earns significantly more than Steven.  Julia's monthly income of $12,144.50 income greatly exceeds her monthly expenses, even after deducting her large voluntary contributions to her 401K.  Conversely, Steven's expenses exceed his income by $898.89 and he has the additional need to pay for his teaching degree.  Steven therefore needs to transition to a lifestyle and career that will be self supporting.  For example, obtaining a teaching license and becoming a full time teacher.
>
> In light of the [c]ourt's consideration of each of the parties' financial situation as discussed above, and giving particular weight to Julia's gross monthly income of $12,144.506, the [c]ourt awards Steven rehabilitative alimony in the amount of [$2,000.00] per month for a period of 48 months beginning [January 1, 2017].  This award is intended to provide Steven time to earn his teaching

8

license and reenter the workforce with that degree, or alternatively to transition his costs of living to reflect his income.

¶23. On December 7, 2016, Steven filed a Rule 59 motion to correct the judgment. On December 15, 2016, Julia filed a motion to reconsider and/or correct the judgment of divorce. In her motion, Julia asserted that in the judgment for divorce, the chancellor recognized that Steven "chose to reduce his income during the marriage and . . . notes that [Steven] is underemployed but [the chancellor] does not seem to consider these facts in property division or alimony award." Julia also argued that although the chancellor stated that the award of rehabilitative alimony is "intended to provide Steven time to earn his teaching license and re-enter the workforce with that degree[,]" Steven already possessed a college degree, so he had no need to obtain four more years of education. Rather, Julia argued, Steven "can obtain his teaching license in a one year time frame due to his existing degree." Julia maintained that this error in calculating the time needed for Steven to obtain a teaching license, "coupled with [Steven] voluntarily being underemployed[,] should cause this Court to reconsider the amount and length of the rehabilitative alimony award."

¶24. On February 24, 2017, the chancellor entered an order on Steven's motion to correct and Julia's motion to reconsider. In his order, the chancellor stated that

> Julia's [m]otion to [r]econsider does not reference [Mississippi Rule of Civil Procedure] 59 and was filed on December 15, 2016, three (3) days after the ten day time frame imposed by [Rule] 59(e). This [m]otion should therefore be considered under [Mississippi Rule of Civil Procedure] 60(b). The possible avenues for relief listed in Rule 60(b)(l) through (5) were not raised by Julia and otherwise do not apply. The [m]otion to [r]econsider should therefore only be granted if she can show "extraordinary and compelling" circumstances pursuant to [Rule] 60(b)(6).

9

The chancellor also addressed Julia's specific request for the chancellor to reconsider its alimony award, explaining as follows:

> In awarding Steven rehabilitative alimony, the [c]ourt gave significant weight to his need for both present and future financial security, that such could not be provided through the equitable distribution of marital assets and that both Julia's present earnings and her future earning capacity greatly exceed his. The [c]ourt also considered (1) the present income and expenses of each party, including their respective payment obligations on installment debt, credit cards and mortgage debt; and (2) Steven's work and earnings history, and more particularly his work history during the marriage and that his hearing disability resulted from his previous employment as an aircraft mechanic.
>
> The [c]ourt acknowledges that Steven may be able to complete the educational and licensing requirements to become a teacher or to otherwise secure academic or vocational training to enter another field of employment in less than four years. However, the [c]ourt believes the four year period to be reasonable and necessary for Steven to not only complete the educational requirements or other training for a new occupation but to provide him the opportunity to refinance or otherwise reduce his financial burdens. As noted in the judgment, Steven's monthly expenses exceed his monthly income by $898.89. The award to Steven of $2,000.00 per month in rehabilitative alimony permits him to meet this monthly deficit and provides an additional $1,011.11 per month to assist him to transition to financial independence as a school teacher or in another occupation. In sum, the award of rehabilitative alimony to Steven is intended to allow him ". . . to become self-supporting without becoming destitute in the interim." *Hubbard v. Hubbard*, 656 So. 2d 124, 130 (Miss. 1995).

On February 24, 2017, the chancellor entered an amended judgment of divorce and added this language to the judgment.

¶25. On March 6, 2017, ten days after the chancellor entered the amended judgment of divorce, Steven filed a Rule 59, or in the alternative, Rule 60, motion to correct or amend the amended judgment of divorce. On March 24, 2017, Julia filed a notice appealing the chancellor's final amended judgment of divorce and the chancellor's denial of her motion

10

for amended judgment notwithstanding the verdict, or, in the alternative, for a new trial.[2]

¶26. "Ordinarily, once a notice of appeal is filed, jurisdiction transfers from the trial court to the appellate court, thereby removing the trial court's authority to amend, modify, or reconsider its judgment." *McNeese v. McNeese*, 129 So. 3d 125, 128 (¶7) (Miss. 2013).

¶27. The record reflects that Steven's Rule 59 motion was timely filed. We have long recognized that "[a] motion to reconsider filed within ten days of the entry of the judgment falls under Rule 59 and tolls the thirty-day time period to file a notice of appeal until the disposition of the motion." *Woods v. Victory Mktg. LLC*, 111 So. 3d 1234, 1236 (¶7) (Miss. Ct. App. 2013). In *Mallery v. Taylor*, 792 So. 2d 226, 228 (¶7) (Miss. 2001), the supreme court clarified as follows:

> [F]iling [an appeal] prior to disposition of a Rule 59 motion is no longer a nullity. Instead, the appeal becomes effective when the Rule 59 motion is disposed of, and, under our rule, the single premature notice is also effective to bring forth issues raised and disposed of in the Rule 59 motion.

*Id.*[3] In *Darnell v. Darnell*, 199 So. 3d 695, 696 (¶4) (Miss. 2016), the supreme court again reiterated that "a notice of appeal only becomes effective when the Rule 59 motion is disposed of. Until disposal of the Rule 59 motion, there is no final appealable judgment." (internal citation omitted).

¶28. Less than a month after Julia filed her notice of appeal, the chancellor entered an April

---

[2] This motion does not appear in the record.

[3] Prior to the supreme court's ruling in *Mallery*, the supreme court held that "[a] notice of appeal filed before the disposition of any of the above motions[,] including Rule 59(e) motions[,] shall have no effect. A new notice of appeal must be filed within the prescribed time measured from the entry of the order disposing of a motion[.]" *Bruce v. Bruce*, 587 So. 2d 898, 901 (Miss. 1991).

17, 2017 order granting Steven's Rule 59, or, in the alternative, Rule 60 motion to correct or amend the amended judgment. The chancellor acknowledged that Julia had filed a notice of appeal, but he stated that "Steven's Rule 59 motion remains pending before the trial court." On April 17, 2017, the chancellor also entered a second-amended judgment of divorce. This second-amended judgment of divorce did not make any revisions to the chancellor's award of rehabilitative alimony.

¶29.    We therefore find that Julia's notice of appeal only became effective once the chancellor entered the April 17, 2017 order granting Steven's Rule 59, or, in the alternative, Rule 60 motion to correct or amend the amended judgment.

¶30.    Turning back to the merits of Julia's appeal, in *Branch*, 174 So. 3d at 945 (¶52), this Court affirmed a chancellor's award of rehabilitative alimony to a spouse in the amount of $1,000 per month for seventy-two months, where "the chancellor specifically intended the alimony award to support Lauren until she found sustainable employment and became self-sufficient." Similarly, in *McCarrell v. McCarrell*, 19 So. 3d 168, 171 (¶10) (Miss. Ct. App. 2009), we found that no error in the chancellor's award of rehabilitative alimony to a spouse in the monthly amount of $1,800 for a period of five years where the alimony "serves the purpose of helping [the spouse] become self-supporting and prevents [him] from becoming destitute while doing so."

¶31.    Upon our review of the record, and keeping in mind that we "will not disturb a chancellor's findings regarding the [rehabilitative alimony] award . . . unless there is manifest error," we affirm the chancellor's award of rehabilitative alimony to Steven in the amount

of $2,000 per month for 48 months. *Larson*, 192 So. 3d at 1141 (¶11).

## II.     Point of Demarcation

¶32.    Julia argues that the chancellor erred in setting May 16, 2016, as the date to determined the end of the accumulation of marital assets. Julia maintains that the chancellor provided the parties with an earlier date at trial.

¶33.    The supreme court has clarified that "the date on which assets cease to be marital and become separate assets—what we refer to herein as the point of demarcation—can be either the date of separation (at the earliest) or the date of divorce (at the latest)." *Collins v. Collins*, 112 So. 3d 428, 431-32 (¶9) (Miss. 2013) (quoting *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶27) (Miss. 2009)). The supreme court reiterated that "chancellors should indicate in the record what date they choose for the point of demarcation and why they choose it." *Id*. at 432-33 (¶13).

¶34.    Here, the record reflects that at the end of the trial, the chancellor announced that "[t]he date for determining equitable distribution, in my view, should be the date of the temporary order[,]" which was September 11, 2015. However, in the December 2, 2016 judgment of divorce, the amended judgment of divorce, and the second amended judgment of divorce, the chancellor set forth that "[a]ll assets and debts at issue in this case were acquired by the parties prior to their separation in April 2015 with income earned during the marriage. Therefore, the [c]ourt finds that all assets and debts are deemed marital property and subject to the equitable distribution analysis below. The [c]ourt uses the date of trial [May 16, 2016] to mark the end of accumulation of assets."

¶35. We find that the chancellor was within his discretion to choose the date of the trial as the point of demarcation. *See Williams v. Williams*, 179 So. 3d 1242, 1251 (¶25) (Miss. Ct. App. 2015).

### III. Retirement Account as Marital Property

¶36. Julia next argues that the chancellor erred in classifying the following as marital property: (1) the money she withdrew from her PERS retirement account and (2) the contributions she made to her Empower 401K after the entry of the order for separate maintenance.

¶37. This Court employs a limited standard when reviewing a chancellor's division and distribution of property in a divorce. *Phillips v. Phillips*, 904 So. 2d 999, 1001 (¶8) (Miss. 2004). "This Court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Id.* Upon review, we examine the chancellor's application of the *Ferguson* factors. *Id.* In so doing, we do not conduct a new *Ferguson* analysis; rather, we "review[] the judgment to ensure that the chancellor followed the appropriate standards and did not abuse his discretion." *Id.*

¶38. Furthermore, "the party arguing to classify an asset as nonmarital property has the burden to demonstrate to the court the asset's nonmarital character." *Wheat v. Wheat*, 37 So. 3d 632, 640 (¶26) (Miss. 2010). The supreme court explained that meeting this burden requires going "beyond a mere demonstration that the asset was acquired prior to marriage." *Id*.

¶39. Julia explains that the $56,484.90 "withdrawals from retirement" listed in the

14

Schedule of Marital Assets represents a PERS retirement account in the amount of $46,732.68 and a Great-West Retirement Services account in the amount of $9,752.22. In his judgment, the chancellor included a footnote explaining that the "total of the funds Julia withdrew from her retirement accounts is also a marital asset subject to equitable distribution." However, Julia argues that she testified at trial that her PERS retirement was "originally acquired when [she] was divorced" from Steven the first time. Julia admitted at trial that contributions to the account had been made during their second marriage, but she now maintains that a portion of the total value of her PERS retirement account should be considered separate property.

¶40. At trial, the record shows that during cross examination, Steven's attorney questioned Julia about whether she provided a statement showing the value of the PERS account on the date of her 2003 marriage to Steven. Julia responded that she was not requested to produce such a document. Steven's attorney responded, "Well, ma'am, I definitely requested it in request of production documents, and you didn't produce them, and I'm going to go through that." The record shows that on her Rule 8.05 financial declaration, Julia attached a W-2 form indicating the value of the PERS account amounted to $46,732.68 when she cashed it out in 2015.

¶41. Regarding the $17,000 in her Empower 401K account, Julia asserts that the majority of the value of the Empower account constituted separate property. The chancellor's judgment reflects that he divided the assets in the Empower account equally between the parties. In so doing, the chancellor also provided that "Julia voluntarily contributes

15

approximately twenty percent of her income from West Jefferson [Medical Center] to her 401K retirement account." Julia asserts that the three trial exhibits, including two of her pay stubs from April 2016, which the chancellor referenced as support for that amount, do not reflect contributions of twenty percent. Rather, Julia argues that her April 2016 pay stubs show that she only contributed fifteen percent of her monthly income to the account. Julia further submits that her contributions made to the account after the order for separate maintenance should be classified as separate property.

¶42. Steven argues, however, that Julia failed to produce a statement for the Empower account, despite being requested to do so in discovery. The trial testimony reflects that Steven's attorney asked Julia if she had a pension plan. Julia responded, "Yes, I do." Steven's attorney asked, "But you didn't put it on [your Rule 8.05 financial statement]?" Julia answered, "Correct." Julia testified, however, that she started accumulating funds in her Empower account in 2014.

¶43. Our review shows that the chancellor set forth the following findings with regard to Julia's retirement account and Empower account:

> Julia voluntarily contributes approximately twenty percent of her income from West Jefferson to her 401K retirement account.
>
> . . . .
>
> Prior to the separation, Julia purchased a home located at 209 Blue Heron Cove, Waveland, MS 39567, as well as a 2015 Mazda. When Julia purchased this home, she used $9,752.22 of her retirement funds from West Jefferson Medical Center to pay off the loan for the Honda Ridgeline. (See Exhibit 14, Page 10). Julia testified that she cashed in additional retirement savings in the amount of $46,732.68 and used these funds to purchase various items and appliances for her new home. (See Exhibit 14, page 8). Through post trial

16

submissions, Julia has detailed how she spent $43,855.23 or this withdrawal.

¶44. The chancellor then performed a *Ferguson* analysis and found that "no non-marital property" existed. Under the factor of "the income and earning capacity of each party," the chancellor made the following determination regarding Julia's retirement accounts:

> Both Steven and Julia have advanced degrees and therefore an ability to earn. However, because Steven has stated the desire to return to school to earn a teaching license, and Julia is currently working as a nurse practitioner, Julia's current earning capacity is much higher than Steven's. Julia also has the income and funds available to voluntarily contribute twenty percent (20%) of her income from West Jefferson to her retirement. This contribution is significantly more than required, and a much greater than Steven is saving towards his retirement through his PERS account.

¶45. Next, the chancellor set forth a schedule distributing the marital assets. Under Julia's assets, the chancellor listed the $56,484.90 from the withdrawals from retirement as well as $8,500, which constituted one-half of her Empower account. The chancellor awarded Steven one-half of Julia's Empower account, amounting to $8,500.

¶46. As stated, Julia bore the "the burden to demonstrate to the court [an] asset's nonmarital character[,]" which requires going "beyond a mere demonstration that the asset was acquired prior to marriage." *Wheat*, 37 So. 3d at 640 (¶26). Julia admitted that she did not produce a statement for her Empower account in discovery, nor did she produce a statement showing the value of the PERS account on the date of her 2003 marriage to Steven. Therefore we cannot say that the chancellor abused his discretion in classifying as marital property the money Julia withdrew from her PERS retirement account and the contributions she made to her Empower 401K after the entry of the order for separate maintenance.

## IV. Attorney's Fees

17

¶47.  Julia also argues that the chancellor erred in awarding Steven attorney's fees. Julia maintains that during trial, her counsel stipulated to the reasonableness of the amount of Steven's attorney's fees, but not to the appropriateness of awarding fees. Julia asserts that the testimony at trial reflected that Steven had been paying for his attorney's fees without substantial hardship. Julia also argues that the entirety of the equitable distribution and rehabilitative alimony awarded to Steven leaves him with the ability to pay his attorney's fees.

¶48.  "Attorney's fees may only be awarded to a party who has shown an inability to pay his or her own fees." *Evans v. Evans*, 75 So. 3d 1083, 1089 (¶22) (Miss. Ct. App. 2011) (citing *Voda v. Voda*, 731 So. 2d 1152, 1157 (¶29) (Miss. 1999)). When awarding attorney's fees, a chancellor should make specific findings regarding the recipient's inability to pay. *Evans*, 75 So. 3d at 1089 (¶22) (citing *Hankins v. Hankins*, 729 So. 2d 1283, 1286 (¶13) (Miss. 1999)). Although "reluctant to disturb a chancellor's discretionary determination [as to] whether or not to award attorney's fees . . . ," Mississippi appellate courts have done so when the record clearly establishes a party's financial ability to pay his or her own attorney's fees. *Watson v. Watson*, 724 So. 2d 350, 356-57 (¶¶29-30) (Miss. 1998) (quoting *Geiger v. Geiger*, 530 So. 2d 185, 187 (Miss. 1988)); *Jones v. Jones*, 155 So. 3d 856, 866 (¶¶37-38) (Miss. Ct. App. 2013); *Duncan v. Duncan*, 815 So. 2d 480, 485 (¶¶17-18) (Miss. Ct. App. 2002).[4]

---

[4] Julia's counsel stipulated to the reasonableness of the amount of Steven's attorney's fees. Thus, an analysis of the *McKee* factors is unnecessary. *See McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982).

¶49. In addressing the issues of Steven's attorney's fees, the chancellor found the following:

> Steven has requested reimbursement for attorney's fees. The [c]ourt notes Steven's balances in his above enumerated retirement accounts and finds that Steven should not be required to liquidate those accounts in order to pay for his attorney's fees. The [c]ourt finds that Steven is unable to pay his attorney's fees and related costs and therefore awards him the same in the amount of $8,540.75 to be paid by Julia.

¶50. Steven testified at trial that he had already paid his attorney $3,250 and had agreed to pay his attorney $250 a month until the total balance of $8,540.75 was satisfied. On his financial declaration, Steven provided his monthly expenses, which included the monthly $250 payment to his attorney. Steven also set forth other monthly expenses, including the following less-than-essential expenses: $196.75 for entertainment, $255 for church donations, $66.67 for other charitable donations, and $55 in pet expenses. In awarding Steven rehabilitative alimony, the chancellor stated the following:

> Steven's monthly expenses exceed his monthly income by $898.89. The award to Steven of $2,000 per month in rehabilitative alimony permits him to meet this monthly deficit[] and provides an additional $1,011.11 per month to assist him to transition to financial independence as a school teacher or in another occupation.

Thus, because Steven included the $250 a month in attorney's fees in his listed expenses, the $2,000 a month in rehabilitative alimony should presumably also cover the attorney's fees.

¶51. The chancellor's judgment itself is void of any specific factual findings that demonstrate Steven's inability to pay his attorney's fees. To the contrary, the record reflects not only that Steven has the ability to pay his attorney's fees, but also that he had in fact already paid $3,250 of the $8,540.75 balance. Where a party is able to pay his attorney's

19

fees, including in situations where the money to pay attorney's fees has been borrowed, an award of attorney's fees is not appropriate. *Meador v. Meador*, 44 So. 3d 411, 421 (¶¶40-42) (Miss. Ct. App. 2010). In the present case, we find that the chancellor abused his discretion by awarding $8,540.75 in attorney's fees to Steven. We therefore reverse and render the chancellor's judgment so as Julia is not required to pay Steven's attorney's fees in this regard.

¶52. Furthermore, on appeal, Steven filed a motion requesting that the appellate court award him attorney's fees in the amount of $10,602 that Steven incurred in replying to Julia's appeal. The supreme court entered an order passing Steven's motion for consideration with the merits of the appeal. "When allowed, this Court has generally granted attorney's fees in the amount of one-half of what was awarded in the chancery court." *Esplin v. Esplin*, 224 So. 3d 102, 106 (¶13) (Miss. Ct. App. 2016). We determine an award of attorney's fees "based on necessity rather than entitlement." *Id.*

¶53. Because we find that the chancellor erred in determining that Steven was unable to pay his attorney's fees due to his limited financial resources, we therefore deny Steven's request for attorney's fees on appeal.

¶54. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, FAIR, WILSON, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.**