# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-01075-COA

**CINCINNATUS E. ALFORD, III**                                   **APPELLANT**

**v.**

**LINDA B. ALFORD**                                              **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/27/2017 |
| TRIAL JUDGE: | HON. VICKI R. BARNES |
| COURT FROM WHICH APPEALED: | SHARKEY COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | STEVEN TODD JEFFREYS |
| ATTORNEYS FOR APPELLEE: | J. MACK VARNER |
| | CLIFFORD C. WHITNEY III |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART; REVERSED AND RENDERED IN PART - 07/23/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE J. WILSON, P.J., GREENLEE AND McCARTY, JJ.**

**J. WILSON, P.J., FOR THE COURT:**

¶1.     After thirty-nine years of marriage, Linda Alford filed for divorce from her husband, Cincinnatus ("Nat") Alford. The Alfords later consented to an irreconcilable differences divorce. The chancellor divided the marital estate and ordered Nat to pay Linda $5,000 per month in periodic alimony, $5,000 for attorney's fees, and $6,000 for expert witness fees. On appeal, Nat argues that the chancellor erred by (1) accepting Linda's valuation of his twenty-five percent interest in a closely held corporation that operates a farm in Sharkey County, (2) awarding Linda $5,000 per month in periodic alimony, and (3) awarding Linda

attorney's fees and expert witness fees.  We find no error in the chancellor's valuation of Nat's interest in the corporation or equitable division of the marital estate.  However, we reverse and remand the alimony award for further proceedings consistent with this opinion, and we reverse and render the award of expert witness and attorney's fees.

## FACTS AND PROCEDURAL HISTORY

¶2.     Nat and Linda married in 1977.  They had two children who were in their thirties by the time of trial.  During the early years of their marriage, the Alfords moved frequently for Nat's work before settling down in Rolling Fork.  Nat has worked in road maintenance equipment sales for many years and was still employed at the time of trial as a regional sales manager for Cimline.  Linda worked as a bookkeeper at Sharkey-Issaquena Academy during the marriage and was still employed there at the time of trial.

¶3.     Nat and Linda separated in November 2014.  Nat told Linda that he was no longer happy and moved out of the marital home.  Nat testified that this decision came shortly after he learned that Linda had incurred $55,000 in credit card debt without his knowledge.  Linda told Nat that she would take care of the debt herself.  However, Nat did not want $55,000 of credit card debt on his credit report, so he used $35,000 of marital funds to pay down the debt, and he and Linda obtained a bank loan at a lower interest rate to pay the rest.  Nat stated that he and Linda had been growing apart for years and that this incident caused him to lose trust in her.  Nat decided that he needed some space, and he left the marital home to stay with friends before moving to Cleveland.  Nat rented an apartment in Cleveland and later bought a condominium there.  He used marital funds for the down payment.

2

¶4.    In February 2016, Linda filed for divorce on the ground of desertion. In April 2016, the court entered an agreed temporary order that required Nat to pay Linda $4,000 per month in temporary support and continue paying for her medical insurance. Nat was granted use and possession of the condo in Cleveland, and Linda was granted use and possession of the marital home in Rolling Fork. In January 2017, Nat and Linda consented to an irreconcilable differences divorce and stipulated that the chancellor would decide issues related to the equitable distribution of the marital estate, alimony, and attorney's fees. The case then proceeded to trial. Linda and Nat were both sixty-three years old at the time of trial.

¶5.    John Paris testified, without objection, as an expert witness regarding the value of Nat's twenty-five percent interest in Cannonwall Plantation Inc., a closely held corporation that operates a farm in Sharkey County.[1] Cannonwall Plantation is owned by Nat and two other individuals. Paris testified that Cannonwall Plantation had assets and liabilities with a net fair value of $553,272. Paris further testified that the net fair value of Nat's twenty-five percent interest was $138,318. Paris explained that the company's fair value was equal to the net value of its assets and liabilities on the day of the valuation and that the fair value of Nat's interest was equal to twenty-five percent of the company's value. In valuing the company's assets, Paris relied primarily on appraised values provided by Nat in discovery.

¶6.    Consistent with her Rule 8.05 financial statement,[2] Linda testified that she had a net

---

[1] Paris is a CPA and a Certified Valuation Analyst who has been a partner and shareholder at May & Company LLP, in Vicksburg since 1989. Paris also testified regarding Nat's income and the tax implications of potential alimony awards.

[2] *See* UCCR 8.05.

monthly income of $1,516.36 and monthly expenses of $6,376.43. She asked the court to award her permanent periodic alimony of $5,000 per month. She also asked the court for an award of attorney's fees and expert witness fees. She testified that she had made partial payments to her attorney and expert in monthly installments, but she said she had "been struggling to" do so.

¶7. Nat's Rule 8.05 statement showed gross monthly income of $10,000, net monthly income of $8,070, and expenses (exclusive of temporary alimony) of $3,109.54. However, Paris testified that Nat's gross monthly income was approximately $15,391 and that his net monthly income was approximately $10,952. Paris relied on a 2016 earnings statement from Cimline and Nat's 2015 tax return, which showed income from Cannonwall, dividends, and interest. Nat testified that Paris's analysis overstated his income because he had record-setting sales in 2015, which resulted in higher-than-normal commissions. Nat also stated that Linda's request for $5,000 per month in periodic alimony was excessive given that they were both approaching retirement. Nat testified that he planned to retire around age sixty-seven.

¶8. The chancellor subsequently entered an opinion and final judgment. The judgment classified and valued the Alfords' property. The parties agreed that certain assets were separate, non-marital property: Linda's 2015 Honda CR-V, which was a gift from her father, and inherited stock and a portion of a Merrill Lynch account owned by Nat, which had a total combined value of $124,824. All other assets, including Nat's interest in Cannonwall Plantation, were deemed marital property. The chancellor divided the marital estate and awarded Linda assets and liabilities with a total net value of $713,123.49. Linda received

4

the marital home, which no longer had a mortgage. The chancellor adopted Paris's valuation of Nat's interest in Cannonwall Plantation and awarded it to Nat. The chancellor awarded Nat marital assets and liabilities with a total net value of $742,730.88. The chancellor also awarded Linda $5,000 in permanent periodic alimony, $5,000 in attorney's fees, and $6,000 in expert witness fees.

¶9. Nat filed a motion to alter or amend the judgment, which the chancellor denied, and a notice of appeal. On appeal, Nat challenges the chancellor's valuation of Cannonwall Plantation, the alimony award, and the award of attorney's fees and expert witness fees.

**ANALYSIS**

¶10. "When reviewing a decision of a chancellor, this Court applies a limited abuse of discretion standard of review." *Mabus v. Mabus*, 890 So. 2d 806, 810 (¶14) (Miss. 2003). "This Court will not disturb the chancellor's opinion when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Id.* at 819 (¶53). However, on issues of law, our standard of review is de novo. *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶26) (Miss. 2009).

¶11. "When this Court reviews a chancellor's judgment of property division we are to review the judgment to ensure that the chancellor followed the appropriate standards and did not abuse his discretion." *McKnight v. McKnight*, 951 So. 2d 594, 596 (¶6) (Miss. Ct. App. 2007) (quotation marks omitted). We also review awards of alimony and attorney's fees for abuse of discretion. *Creekmore v. Creekmore*, 651 So. 2d 513, 520 (Miss. 1995); *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993). However, "[i]f we find the chancellor's

5

decision manifestly wrong, or that the court applied an erroneous legal standard, we will not hesitate to reverse." *Armstrong*, 618 So. 2d at 1280.

## I.     Cannonwall Plantation

¶12.    As stated above, Paris testified that the net fair value of Cannonwall Plantation's assets and liabilities was $553,272 and that the fair value of Nat's twenty-five percent was $138,318. Paris presented a "fair value balance sheet" for the business, which showed its assets—including cash, accounts receivable, loans to shareholders, and buildings and equipment—and liabilities—including mortgages, loans, and accounts payable. Paris testified that he valued the buildings and equipment based on appraisals provided by Nat during discovery. Paris testified that he did not estimate the "fair market value" of the farm as a going concern because such a value necessarily would have included goodwill as a component of the farm's value. Paris testified that under Mississippi law goodwill should not be included in a business valuation prepared for purposes of the equitable division of marital assets in a divorce case. Thus, Paris used an asset-based approach to valuation, which measures only the fair value of the company's assets and liabilities excluding goodwill. Paris testified that his valuation of Cannonwall Plantation was consistent with standard accounting and valuation principles. Nat did not present any testimony or other evidence to contradict Paris's opinion.

¶13.    Paris's understanding of Mississippi law on the subject of goodwill is correct. The Mississippi Supreme Court has held that "'goodwill,' whether 'personal goodwill' or 'business enterprise goodwill' shall not be included in the valuation of [a business for

purposes of equitable distribution in a divorce]. Goodwill is simply not property; thus it cannot be deemed a divisible marital asset in a divorce action." *Yelverton v. Yelverton*, 961 So. 2d 19, 30 (¶21) (Miss. 2007) (citation, footnote, quotation marks, and brackets omitted); *accord Lacoste v. Lacoste*, 197 So. 3d 897, 908 (¶34) (Miss. Ct. App. 2016). Therefore, Paris properly valued Cannonwall Plantation without including any value attributable to goodwill.

¶14. Nonetheless, Nat finds two flaws in Paris's valuation. First, he argues that Paris improperly estimated the business's "fair value" rather than its "fair market value." We note that the distinction between these two concepts is not entirely clear from Paris's testimony, and Nat presented no expert testimony of his own. Nonetheless, Paris's valuation method is essentially the same as the method that we approved in *Dunaway v. Dunaway*, 749 So. 2d 1112, 1117-18 (¶13) (Miss. Ct. App. 1999). In that case, the chancellor "valued the various physical assets making up the farming operation, assigning a market value to each component." *Id.* Essentially, the chancellor valued the farm based on "the break-up value of the various assets used in the operation." *Id.* We held that the chancellor did not err by using the liquidation value of the company as a floor for its value rather than attempting to value the farm as a going concern. *Id.* Paris did essentially the same thing in this case. Although he referred to the "fair value" of the assets, he primarily relied on appraisals that Nat provided to determine the values of the farm's physical assets. Nat does not challenge the value that Paris assigned to any particular asset or liability of Cannonwall Plantation. He only objects to Paris's terminology. Consistent with our decision in *Dunaway*, we find no

7

error in the chancellor's reliance on Paris's testimony.

¶15. Nat also argues that Paris and the chancellor were required to apply a lack-of-marketability discount to his twenty-five percent interest in the farm because he is a minority owner. Paris agreed that a thirty percent discount might have been appropriate *if* he had valued the business as a going concern with goodwill included. However, for the reasons discussed above, Paris did not perform such a valuation, and he testified that it would not be appropriate to apply a discount to the asset-based valuation that he did perform. Nat presented no testimony or evidence to contradict Paris's expert testimony on this issue.

¶16. On appeal, Nat cites *Cox v. Cox*, 61 So. 3d 927 (Miss. Ct. App. 2011), in support of his argument that the chancellor was bound to apply a discount. In *Cox*, the chancellor applied a lack-of-marketability discount to the value of a business at the time of the parties' separation but did not apply a similar discount to the value of the business at the time of the parties' marriage. *See id.* at 936 (¶29). As in this case, the chancellor's decision was consistent with expert testimony at trial. *See id.* at 934 (¶23). This Court stated that "the fair market value of a business is a question for the trier of fact," and "we defer to the chancellor's findings of fact when supported by the evidence and not manifestly wrong." *Id.* at 936 (¶29). We affirmed because the chancellor's findings were not clearly erroneous. *Id.* That we found no clear error on the facts of *Cox* does not mean that the chancellor in this case was required to apply any particular discount. Indeed, as in *Cox*, the chancellor's finding in this case is consistent with the expert testimony at trial.

¶17. In summary, although Nat argues that Paris's valuation of Cannonwall Plantation was

too high, Nat did not offer any alternative valuation or present any evidence that a discount should have been applied. *See Dunaway*, 749 So. 2d at 1118 (¶14) ("[I]t is incumbent on the parties, and not the chancellor, to prepare evidence touching on matters pertinent to the issues to be tried."). The chancellor's valuation is supported by the record and is not clearly erroneous. Therefore, it must be affirmed. *See id.* at 1121 (¶28).

## II.    Alimony

¶18.    "After the marital property is equitably divided, the chancellor must consider whether the division, in light of the parties' nonmarital assets, will adequately provide for both parties; if so, then 'no more need be done.'" *Rodrigue v. Rodrigue*, 172 So. 3d 1176, 1187 (¶41) (Miss. Ct. App. 2014) (quoting *Johnson v. Johnson*, 650 So. 2d 1281, 1287 (Miss. 1994)). Alimony should be considered only if the equitable division of marital estate, together with any separate property, "leaves a deficit for one party." *Id.* at (¶42). By "deficit," we mean that "the spouse seeking alimony is left 'with a deficit with respect to having sufficient resources and assets to meet his or her needs and living expenses.'" *Layton v. Layton*, 181 So. 3d 275, 282 (¶17) (Miss. Ct. App. 2015) (emphasis omitted) (quoting *Jackson v. Jackson*, 114 So. 3d 768, 777 (¶22) (Miss. Ct. App. 2013)).

¶19.    If one party is left with a deficit, the chancellor must consider the *Armstrong* factors in determining whether to award alimony and the amount and type of the award. *Lauro v. Lauro*, 847 So. 2d 843, 848 (¶¶11-13) (Miss. 2003). The *Armstrong* factors are:

1.    The income and expenses of the parties;

2.    The health and earning capacities of the parties;

9

3.      The needs of each party;

4.      The obligations and assets of each party;

5.      The length of the marriage;

6.      The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;

7.      The age of the parties;

8.      The standard of living of the parties, both during the marriage and at the time of the support determination;

9.      The tax consequences of the spousal support order;

10.      Fault or misconduct;

11.      Wasteful dissipation of assets by either party; or

12.      Any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.

*Armstrong*, 618 So. 2d at 1280.

¶20.   In the present case, Linda claimed that she had total monthly income from her job of $1,840.13 and net monthly income of $1,516.36.  She claimed total monthly expenses of $6,376.43.  She asked the court to award her $5,000 in periodic alimony to make up the difference between her income and her claimed expenses.  The chancellor found that Linda's actual expenses were $6,076.43 per month.[3]  The chancellor then awarded Linda $5,000 per

---

[3] The chancellor reduced Linda's claimed expenses by the $200 per month she claimed in auto repair expenses and the $100 per month she claimed in church donations. The chancellor noted that Linda admitted that she "no longer ha[d] expenses for auto repairs" (because her father had given her a new car) and that her "church donations [were] part of her [separate line item for] charitable contributions."

month in periodic alimony, exactly as Linda had requested.

¶21. On appeal, Nat argues that the alimony award is excessive. He argues that the chancellor did not adequately consider that the parties are nearing retirement age and that Linda will soon be eligible to receive Social Security benefits. He also argues that the chancellor did not adequately consider the assets that Linda received as part of the equitable distribution of the marital estate, as well as the anticipated future income and returns that those assets will produce. Finally, Nat argues that Linda's claimed expenses are overstated. We consider these arguments in turn.

### A. Derivative Social Security Retirement Benefits

¶22. At trial, Linda expressly presented her claim for periodic alimony on the assumption that when she began drawing derivative Social Security retirement benefits based on Nat's earnings, her alimony automatically would be reduced by the amount of those benefits. Linda testified on direct examination that she understood that her "alimony award will be cut by" "whatever amount" of derivative benefits she receives. Next, John Paris testified on direct examination that, under Mississippi law, Linda's receipt of derivative benefits "would reduce [Nat's] alimony payment dollar for dollar" "as soon as" Linda began receiving those benefits. Paris testified that Linda could expect to receive $1,304 per month in derivative benefits beginning around age sixty-six. Finally, Linda's lawyer asked Nat on cross-examination if he understood that court-ordered alimony would be reduced by whatever derivative Social Security benefits Linda received. Nat confirmed that he understood that the law would allow him to make such a reduction.

11

¶23. Linda's characterization of Mississippi law was correct when this case was tried and when the chancery court entered its final judgment. In *Spalding v. Spalding*, 691 So. 2d 435 (Miss. 1997), the Supreme Court held that a payor spouse is entitled to an automatic, dollar-for-dollar credit against his alimony obligation for derivative Social Security retirement benefits received by the payee spouse. *Id.* at 438-39.

¶24. However, six months after the chancery court entered its final judgment in this case, the Supreme Court overruled *Spalding*. In *Harris v. Harris*, 241 So. 3d 622 (Miss. 2018), the Court held that "Social Security benefits derived from the other spouse's income *do not* constitute a special circumstance triggering an automatic reduction in alimony." *Id.* at 628 (¶19). The Court further held that a chancellor may not modify alimony based on the payment of derivative Social Security benefits unless, inter alia, such payments constitute "an *unforeseen* material change in circumstances." *Id.* (emphasis added); *see also id.* at 629 (¶21) (holding that "the trial court's failure to consider . . . the foreseeability of Social Security payments [was] reversible error").

¶25. The alimony award in this case should be reevaluated in light of *Harris*. Linda requested permanent alimony of $5,000 per month on the assumption that her alimony would decrease automatically once she began drawing derivative Social Security retirement benefits. The chancellor then awarded alimony in the exact amount that Linda requested. However, in light of *Harris*, Linda's assumption is no longer correct. Moreover, *Harris* specifically holds that derivative Social Security benefits will not justify a subsequent modification of alimony if the benefits were anticipated or foreseeable at the time of the

12

divorce. *Id.* at 628-29 (¶¶19-21). In this case, the parties clearly foresaw that Linda would receive derivative benefits in the near future. Indeed, Paris testified regarding the projected amount and timing of Linda's benefits. Under *Harris*, such a clearly foreseeable circumstance will not justify a later modification of alimony. *Id.* Rather, it is a circumstance that the chancellor should consider in making the *initial* determination of alimony. In this case, the chancellor's ruling did not take this circumstance into account. Accordingly, we conclude that it is necessary to reverse and remand the case for further consideration of the issue of alimony in light of the Supreme Court's intervening decision in *Harris*. In awarding alimony, the chancellor should consider the clearly foreseeable fact that Linda will receive derivative Social Security retirement benefits in the near future.

### B. Linda's Assets

¶26. The chancellor awarded Linda marital assets and liabilities with a total net value of $713,123.49. This included $134,115.06 in an ordinary Merrill Lynch stock account and more than $375,000 in tax-deferred retirement accounts. Linda's expert (Paris) testified that Linda should invest conservatively given that she's approaching retirement; however, Paris testified that Linda could still expect to earn five to six percent annually, which she could use for her benefit without reducing the balances of those accounts. Paris also projected that Nat would earn dividend income of $861 per month from his Merrill Lynch account; however, the chancellor ultimately awarded half of that account to Linda. Nat argues that the chancellor failed to consider Linda's anticipated investment earnings and dividend income. Nat is correct that the chancellor did not specifically consider these assets or related income

13

in her *Armstrong* analysis. Indeed, the chancellor relied on Paris's projection of Nat's income without acknowledging that the figure still included projected dividend income for the undivided the Merrill Lynch account.

¶27. We have already determined that the alimony award must be reversed and remanded for further consideration in light of *Harris*, *supra*. Therefore, it is unnecessary for us to determine definitively whether the chancellor erred or abused her discretion by not considering Linda's anticipated investment earnings and dividend income. We simply hold that on remand the chancellor should consider the extent to which Linda's assets and the anticipated income from those assets will increase her income and reduce her need for alimony. *See, e.g.*, *Williams v. Williams*, 129 So. 3d 233, 242 (¶37) (Miss. Ct. App. 2013); *Cosentino v. Cosentino*, 986 So. 2d 1065, 1068 (¶9) (Miss. Ct. App. 2008) (citing *Johnson v. Johnson*, 650 So. 2d 1281, 1287 (Miss. 1994)).

### C. Linda's Expenses

¶28. As noted above, Linda submitted a Rule 8.05 financial statement claiming monthly expenses of $6,376.43, and the chancellor found that her actual monthly expenses were $6,076.43. On appeal, Nat argues that certain of Linda's claimed expenses are inflated and lack support in the evidence. In addition to the expenses that the chancellor disregarded, *see supra* n.3, Nat challenges the following alleged expenses: $400 per month for clothing, $200 per month for out-of-pocket medicals, $350 per month for gas and oil for her car, and $275 per month for yard maintenance. Nat argues that these expenses were not reflected in the few months of bank statements that he offered into evidence. However, Linda testified that she

14

had provided accurate estimates of her expenses on her Rule 8.05 statements. She further testified that those expenses fluctuated and would not always be reflected on her bank statements. It is up to the chancellor, as the trier of fact, to weigh such conflicting evidence and determine whether a witness is credible. *See, e.g.*, *Mayton v. Oliver*, 247 So. 3d 312, 322 (¶¶33-34) (Miss. Ct. App. 2017).

¶29.    Nat also argues that the chancellor should have disregarded in whole or in part certain alleged expenses that "were likely to be reduced or come to an end in months." Specifically, Nat points to $506 in "Pet Expenses," a $500 per month credit card payment, and a $409.28 per month loan payment. Linda testified that the "Pet Expenses" relate primarily to medical expenses for the couple's twelve-year-old Labrador who suffers from diabetes and cataracts. The $500 per month credit card payment also relates to veterinarian bills for the dog. The balance on the credit card at the time of trial was $5,848.44. Finally, the loan had a balance of $3,683.52 at the time of trial and was scheduled to be paid off in nine months.

¶30.    For the reasons discussed above, we have already determined that it is necessary to reverse and remand the alimony award for further consideration in light of *Harris*, *supra*. On remand, the chancellor should determine alimony based on the circumstances as they exist at the time of remand. *See Yelverton v. Yelverton*, 26 So. 3d 1053, 1057 (¶13). If certain expenses have been eliminated since the end of trial, then the chancellor should not consider them in determining Nat's prospective alimony obligation.

### III.    Attorney's fees

¶31.    "An award of attorney's fees is appropriate in a divorce case where the requesting

party establishes an inability to pay." *Gray v. Gray*, 745 So. 2d 234, 239 (¶26) (Miss. 1999). "The party seeking attorney's fees is charged with the burden of proving inability to pay." *Riley v. Riley*, 846 So. 2d 282, 287 (¶23) (Miss. Ct. App. 2003) (citing *Jones v. Starr*, 586 So. 2d 788, 792 (Miss. 1991)). "It is well settled in Mississippi that if a party is financially able to pay an attorney, an award of attorney's fees is not appropriate. Furthermore, if the record is insufficient to demonstrate the wife's inability to pay the attorney's fees, then an award of the fees is an abuse of discretion." *Gray*, 745 So. 2d at 239 (¶26) (citations omitted).

¶32.    At trial, Linda offered a list of invoice amounts prepared by her attorney that showed that he had billed her a total of $24,572.94, which included the trial. Linda also requested expert witness fees (for Paris) in the amount of $6,000. Linda and her attorney both testified that she had been paying $1,000 per month in attorney's fees, although neither of them could say how much she had paid in total. Linda also testified that she had been paying $500 per month to Paris's firm, although she did not state how much she had paid or how much was left to pay. Linda testified that she had been able to make her monthly payments to her attorney and expert, although she said that she had "been struggling to" do so. Linda's attorney testified regarding his time and fees and Linda's ability to pay. On cross-examination, he was asked whether the equitable distribution of the marital assets would provide Linda with sufficient "financial resources to pay [her fees]." In response, he stated, "I would certainly hope that the [c]ourt awards [Linda] what [she] requested, which is 50 percent of the marital assets. If that occurs, then she certainly would have the money to pay

16

me at that time. I would agree with that."

¶33. Following the trial, the chancellor found that Linda had the ability to pay some but not all of her attorney's fees. The chancellor then ordered Nat to pay her $5,000 for attorney's fees and $6,000 for expert witness fees.

¶34. We conclude that the award of attorney's fees and expert witness fees was an abuse of discretion because "the record is insufficient to demonstrate [Linda's] inability to pay." *Gray*, 745 So. 2d at 239 (¶26). Linda testified that she had been able to pay her attorney's fees and expert witness fees in monthly installments of $1,000 and $500, respectively, and she failed to show how much she had already paid or what she still owed. In addition, Linda was awarded bank accounts with a combined balance of approximately $17,000, a Merrill Lynch account with a balance of $134,115.06, and retirement accounts with a combined balance in excess of $375,000. Linda received nearly half of the marital assets, which her attorney agreed would be sufficient to allow her to pay her attorney's fees. There is nothing in the record to show that Linda would have been required to liquidate any significant part of her savings to pay her attorney or her expert. Indeed, as stated, the record does not even show what Linda owed at the time of trial. On these facts, Linda failed to meet her burden of establishing an inability to pay her fees. *See, e.g.*, *Dauenhauer v. Dauenhauer*, 271 So. 3d 589, 601 (¶51) (Miss. Ct. App. 2018) (holding that award of attorney's fees was an abuse of discretion where the spouse had already paid part of his fees in installments and had sufficient assets to pay the balance). Accordingly, the award of attorney's fees is reversed and rendered.

17

**CONCLUSION**

¶35. We affirm the chancellor's valuation of Cannonwall Plantation and division of the marital estate. However, we reverse and remand the alimony award for further proceedings consistent with this opinion, including further consideration in light of the Supreme Court's intervening decision in *Harris*, *supra*. We also reverse and render the award of attorney's fees because Linda failed to demonstrate an inability to pay.[4]

¶36. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART; REVERSED AND RENDERED IN PART.**

    **BARNES, C.J., CARLTON, P.J., WESTBROOKS, TINDELL, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. GREENLEE, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY TINDELL, McDONALD, LAWRENCE AND McCARTY, JJ.**

    **GREENLEE, J., SPECIALLY CONCURRING:**

¶37. I concur with the majority. However, because I am concerned about the effect *Harris v. Harris*, 241 So. 3d 622 (Miss. 2018), may have in this case and other cases, I specially concur.

¶38. Our supreme court's decision in *Harris* has the potential to greatly impact those in our population who are aging and under a court-ordered duty of support. For our citizens who earn their wages through compensation from work for others, there comes a time that many should at least consider retirement, if retirement is not required or decided for them. The litigants in this case, if not retired, are rapidly approaching retirement.

---

[4] Linda filed a motion in this Court requesting an additional award for attorney's fees on appeal. Because we reverse and render the chancery court's award of attorney's fees, we also deny Linda's motion for appellate attorney's fees. *Dauenhauer*, 271 So. 3d at 601 (¶¶52-53).

¶39. In such cases, the problem chancellors face is in reliably predicting the impact of retirement upon the earnings of the parties. *Harris* should not mean that once retirement occurs to one or both of the parties (although foreseeable at the time of the initial support order) that the parties are foreclosed from asking the court for a modification based on a material and substantial change in circumstances. *See Plummer v. Plummer*, 235 So. 3d 195, 199 (¶14) (Miss. Ct. App. 2017) (modification of alimony requires proof of a material and substantial change in circumstances since the date of the prior judgment). If the application of our law is to foreclose a litigant's request for a modification of periodic alimony upon that party's retirement, such could mean that in order to meet the amount required, that party must not retire. If that is the case, has our law not imposed a servitude upon a citizen until death? Retirement is a substantial change to an individual's circumstances, and *Harris* should not be allowed to hinder such a change from being brought before the chancellor for consideration.

¶40. I, therefore, specially concur.

**TINDELL, McDONALD, LAWRENCE AND McCARTY, JJ., JOIN THIS OPINION.**